## LOUIS GLASER, Appellant, v. ALBERT ROTHSCHILD.

### In Banc, June 8, 1909.

1. **NEGLIGENCE: Instruction: Assumption of Fact: Ordinary Care.** An instruction for defendant which tells the jury that plaintiff was guilty of a lack of ordinary care, and that if he failed to exercise ordinary care he could not recover, is erroneous. It is tantamount to telling the jury that plaintiff could not recover. And an instruction telling the jury that "if you believe from the evidence that at the time plaintiff sustained the injuries complained of there was sufficient light in the cellar for a person of average eyesight to easily see the depression in the floor in the basement, into which plaintiff claims he fell, and if you further believe from the evidence that had plaintiff been in the exercise of ordinary care he would have detected the said depression and would have avoided falling therein," then he cannot recover, is such an instruction. It in effect assumes that plaintiff was not exercising ordinary care.

2. ———: ———: **That There is No Evidence.** An instruction for defendant told the jury that "there is no evidence in this case to sustain the charge in plaintiff's petition that defendant left said basement without light or illumination of any kind." The petition charged that the basement was without light of any kind, but the evidence did not show it was totally dark, but did tend to show a degree of darkness so great that an ordinarly prudent person by a reasonable use of his eyesight would not have discovered the pit into which plaintiff fell. *Held*, error. The evidence did not measure up to the allegation, but it was erroneous to instruct the jury in broad, sweeping terms that there was no evidence whatever to sustain it.

3. ———: ———: **That Plaintiff Did Not Look.** Plaintiff went to the basement of defendant's building to visit a toilet. In the basement was the elevator pit, and between the pit and piles of boxes was a passageway two and a half feet wide, and in attempting to pass through it to the toilet he fell into the unguarded pit. *Held*, that the court should not have instructed the jury that plaintiff testified that had he looked he could have seen the passageway between the boxes and pit, in view of all his testimony which was to the effect that he

did look, that he saw the boxes, elevator shaft and passage way, that the darkness prevented him from seeing the pit, that had he known the pit was there and had he been looking for it the light might have been sufficient for him to have seen it, but not knowing of its existence and having no occasion to look specially for it he did not see it on account of the poor light.

4. ———: ———: **Well Holes: Guard Rails: Statute.** In a suit by a visitor to a mercantile establishment against its proprietor, the court should not give an instruction telling the jury that the statute required an elevator pit in said building to be protected by strong rails. That statute has no application to any person except employees.

5. **STATUTORY CONSTRUCTION: The Whole Act.** To ascertain the meaning and application of a statute all acts and statutes relating to the same subject-matter should be considered together.

6. ———: ———: **Title: Sec. 6435, R. S. 1899: Employees.** The title of an act is necessarily a part of it, and in construing the act the title should be taken into consideration. The title to the Act of 1891 (Sec. 6435, R. S. 1899) relates wholly to the health of employees and the inspection of buildings in which they work; and the title being considered in connection with the whole act, and all its twenty-eight sections being considered together, it is clear that sections 5 and 19 thereof refer only to employees, and do not authorize the court, in a suit by an invitee or licensee to a mercantile building to recover damages for injuries he received when he fell into an unguarded elevator pit in the basement, to instruct the jury that the said statute required the defendant proprietor to protect said pit by strong guard-rails.

7. **NEGLIGENCE: Invitee: Duty.** One who goes upon the premises of another by that other's invitation and for that other's purposes is an invitee, and the duty of that other to take ordinary care to prevent his injury at once arises, and for a breach of that duty an action lies. And the word "invitation" covers and includes in it enticement, allurement and inducement, if the case in judgment holds such features.

8. ———: ———: **Plaintiff's Convenience.** Plaintiff, in response to an invitation and request from defendant to visit his wholesale hat store for purposes of consultation as to certain investments, went to defendant's office, found him opening his mail and was requested to wait until he had finished, and thereupon he remarked, "If you wish to finish your mail, I think I

Glaser v. Rothschild.

shall have to go to the toilet." Defendant called an employee, and told him to get the key to the toilet and show plaintiff to it. In obedience to the employee's instruction plaintiff went down the steps into the basement, and started for the toilet along a narrow, irregular passageway between high boxes on one side and an unguarded elevator pit on the other, fell into the pit and was injured. The defendant knew the pit was dangerous and unlighted, and plaintiff knew not that it had usually been lighted or that the lights were broken, nor did he know that the toilet was reserved for officers, customers and visitors. *Held*, that plaintiff was an invitee, not only when he entered the office, but when he was requested to wait and on the way to the toilet, and the action lies. It was for defendant's convenience that he waited, and as he waited he was entitled to the usual conveniences attending the waiting, and the visit to the store, the waiting and the visit to the toilet are elements of a single and inseparable transaction.

*Held*, by WOODSON, J., with whom VALLIANT, C. J., and FOX, J., concur, that the invitation to visit the store embraced no more than an invitation to visit its office where the business was to be transacted, and not to visit other parts of it, and that what plaintiff did in going to the toilet he did for his own convenience, profit or pleasure, as a mere licensee, and no action lies.

Appeal from St. Louis City Circuit Court.—*Hon. Selden P. Spencer*, Judge.

REVERSED AND REMANDED.

*David Goldsmith* and *Lee Sale* for appellant.

(1) Instruction 4 given by the court at the instance of defendant was erroneous. (2) Instruction 5 given by the court at the instance of defendant was erroneous. Coffey v. City of Carthage, 186 Mo. 583. (3) Instruction 1 given by the court at the instance of defendant was erroneous. (4) The refusal of instruction 3 asked by plaintiff was erroneous. Plaintiff had the right to proceed upon the assumption set forth in this instruction. Hollis v. Merchants Assn., 205 Mo. 520; Nephler v. Woodward, 200 Mo. 188; Hartman v. Muchbach, 64 Mo. App. 565; Nichols v. Railroad, 83 Va. 99; Curtis v. Kiley, 153 Mass. 123; Pow-

ers v. Harlow, 53 Mich. 507; Wilsey v. Jewett Bros. & Co., 98 N. W. 114. And plaintiff was entitled to have the jury informed by instruction of this right. Roe v. City of Kansas, 100 Mo. 193; Sullivan v. Railroad, 117 Mo. 224; Perrette v. Kansas City, 162 Mo. 249; Holloway v. Kansas City, 184 Mo. 30; Cassaday v. Kansas City, 119 Mo. App. 118; Stout v. Columbia, 118 Mo. App. 443; Gordon v. City of Richmond, 83 Va. p. 440 (cited with approval in 205 Mo. 521); City of Indianapolis v. Gaston, 58 Ind. 228; Board of Commissioners v. Legg, 110 Ind. 482. (5) The refusal of instruction No. 2 asked by plaintiff was erroneous. R. S. 1899, sec. 6435. The decisions of this court relied upon by respondent as warranting the refusal of this instruction are not in point. Maguire v. Spencer, 91 N. Y. 305; Weller v. Railroad, 120 Mo. 652; Perrette v. Kansas City, 162 Mo. 249. (6) There is no competent evidence of contributory negligence. Nephler v. Woodward, 200 Mo. 1790; Warner v. Mier, etc., Co., 58 N. E. 554; Sheyer v. Lowell, 134 Cal. 359.

*Seddon & Holland* for respondent.

(1) The verdict and judgment are for the right party. Reardon v. Thompson, 149 Mass. 267; McGill v. Compton, 66 Ill. 327; O'Brien v. Western Steel Co., 100 Mo. 182; Stevens v. Nichols, 155 Mass. 472; Converse v. Walker, 30 Hun 596; Benson v. Machine Co., 77 Md. 535; Sterger v. Van Strickland, 132 N. Y. 499; Heinlein v. Railroad, 147 Mass. 136; Evansville v. Griffin, 100 Ind. 221; Severy v. Nickerson, 120 Mass. 306; Sweeny v. Railroad, 92 Mass. 372; Parker v. Publishing Co., 69 Me. 173; Faris v. Hoburg, 134 Ind. 269; Pierce v. Whitcomb, 48 Vt. 127; Glaser v. Rothschild, 106 Mo. App. 418; Metcalf v. Cunard, 147 Mass. 66. The court did not err in giving instruction 5. State v. Brooks, 99 Mo. 137; Feary v. Railroad, 162 Mo. 106; Sweeny v. Railroad, 150 Mo. 385; Pratt

v. Conway, 148 Mo. 292; Walker v. City, 99 Mo. 647; Carroll v. Railroad, 88 Mo. 239. (3) The court did not err in giving instruction 1 at the instance of defendant. (4) The court did not err in refusing instruction 3. Culbertson v. Railroad, 140 Mo. 35; Lynch v. Railroad, 112 Mo. 422; Weller v. Railroad, 120 Mo. 635. (5) The court did not err in refusing instruction 2. Authorities under point 4.

LAMM, J.—This case was argued and submitted in Division One. That division was equally divided on the main contention in the case, to-wit, whether Glaser was an invitee at the time he was injured or whether he was a mere licensee. The cause having been transferred to Banc, the majority of the Brethren were of opinion he was an invitee. The opinion of our Brother Woodson in division, to whom the case was there assigned and by whom it was written, did not meet the approval of the majority on that point. His divisional opinion will be appended hereto as a dissent on that point, but we all agree that his statement of the case is correct. We all agree that paragraphs one, two and three of his opinion correctly rule that there was error in the instructions as pointed out. A majority of the court agree with paragraph four in his opinion. On that paragraph I stand *dubitans*. On paragraph five which holds that plaintiff had no case and that the judgment should be affirmed in spite of the errors in the instructions, BURGESS, GANTT and GRAVES, JJ., agree with me in ruling as follows:

(a) In such cases as this the root of the thing, the deciding question, is: Do the facts raise a duty, a breach of which is shown? [Pierce v. Whitcomb, 48 Vt. 127; Sweeny v. Old Colony R. R., 10 Allen 368.] There are such sure and clear words in the law in that behalf that all doubts are resolved and one who runs may read. The general rule is that the owner

or occupier of premises lies under no duty to protect those from injury who go upon the premises as volunteers or merely with his express or tacit permission from motives of curiosity or private convenience in no way connected with business or other relations with the owner or occupier. [Hargreaves v. Deacon, 25 Mich. 5; Benson v. Baltimore Traction Co., 77 Md. 535; Railroad v. Slaughter, 167 Ind. 330, and cases cited; see, also, *arguendo*, O'Brien v. Steel Co., 100 Mo. 182, and Glaser v. Rothchild, 106 Mo. App. 418; Kelly v. Benas, 217 Mo. 1.]

A bare licensee (barring wantonness or some form of intentional wrong or active negligence by the owner or occupier) takes the premises as he finds them. His fix may be likened unto that of one who, buying lands, buys stones; or, buying beef, buys bones; or borrowing a coat, takes it with holes in and buttons off—that is, in the use of his bare license he takes on himself the risk of perils from defects in the premises. Mere permission without more involves "leave and license," but bestows no right to care. If A give B leave to hunt mushrooms for his table in A's field, and B fall into a ditch, or uncovered pit, and is harmed, no duty was raised, no breach is made and, hence, no action lies. As put by way of illustration in the books, suppose A owns a sea-view, a cliff, and gives B permission to walk on the edge of the cliff for pleasure or air, it would be absurd to contend that such leave cast on A the burden of fencing the cliff to keep B from falling off.

(b) But the situation with reference to liability radically changes when the owner invites the use of his premises for purposes connected with his own benefit, pleasure and convenience. That change calls into play other rules of law in order to do full and refined justice. The rule applicable to that change is that a licensee who goes upon the premises of an-

other by that other's invitation and for that other's purposes is no longer a bare licensee. He becomes an invitee and the duty to take ordinary care to prevent his injury is at once raised and for the breach of that duty an action lies. [See authorities, *supra*; Pauckner v. Wakem, 231 Ill. 276; and a line of cases cited by GILLET, J., in the Slaughter case, *supra*; also, Nephler v. Woodward, 200 Mo. 179, *arguendo*.]

The word "invitation" used in the rule covers and includes in it enticement, allurement and inducement, if the case in judgment holds such features. Also, the invitation may be implied by a dedication, or it may arise from known customary use. [Drennan v. Grady 167 Mass. 415; and cases, *supra*.] So, too, it is held in all the cases that the invitation may be implied by any state of facts upon which it naturally and reasonably arises.

(c) Now, in applying those settled principles of general law to the facts of this case, how does it stand?

(1) We need waste no time on the question of known customary use of Rothschild's locked water closet by visitors or customers at his store. This is so because Glaser was not invited to the closet by any such use. He did not know of such use and hence did not act on nor was he induced by it to go to the dark basement of the store and take the path to the closet bounded by boxes on one side and the unguarded elevator pit on the other. If he had gone there on the strength of a right bottomed on an invitation arising by known customary use, then another and different case would be here. In such hypothetical case we would have to deal with the locked door and the key thereto kept in the office. Respondent's learned counsel argues that the lock and key destroy the idea of a common use in those who visited the store on its owner's business—the class to which Glaser belonged. A lock to a door and a key retained

by the owner might, or might not, show no such use. It might be a question of fact, not of law—*e. g.*, a lock might be put on the door of a convenience like a water closet and a key to the lock be kept by some one of a class of persons, for the very purpose of confining the use of that convenience to such class, as distinguished from the public at large or other classes, to-wit, the ordinary help of the establishment. But, as pointed out, under the facts of this record the significance of the locked door and of the key kept in the office need not be judicially determined.

(2) In getting at the essence of and giving reasonable scope to the rules of law applicable to the liability of the owner for injuries received by an invitee, it has been well held that his license does not give him the right to roam at will, without further invitation, to out-of-the-way places on the premises, wholly disconnected from and in no way pertaining to the business in hand; for instance, to the roof from a curiosity to see a passing street pageant, to the garret to find what his prying eye may search out there, to the basement for a like purpose. Thus, in Parker v. Portland Publishing Co., 69 Me. 173, a person having business only with the counting room of a newspaper on the first floor of the establishment found it closed. The object of his visit being frustrated, he enlarged its scope by bethinking himself to visit the editorial room upstairs, and in going through a dark hallway he fell into an elevator shaft. It was held he could not recover. There was no invitation extended to him to visit the editor in his fruitful (yet boding) seclusion.

So, in Pierce v. Whitcomb, *supra,* a party out of oats went to a neighbor's to buy some. The neighbor was not a dealer in oats—he had none to sell. But yielding to importunity he went with the buyer to a dark locked granary holding the stored oats and left the buyer in a safe place while he searched for a measure to measure out the oats. The buyer, un-

known to the seller, and in his temporary absence, wandered from his safe place and fell into a hole and was harmed. The case, says the judge writing it, is the same as if the buyer leaving his safe place in the dark had stumbled over a rake and hurt himself on its upturned teeth or had injured his eye by coming in contact with the point of a suspended scythe. In holding there could be no recovery, REDFIELD, J., laid down no principle of law, I submit, casting plaintiff in the case at bar. The same (as I see it) may be safely said of the other cases reviewed by my brother and relied on by him—all of them are distinguishable from this one on principle and ride off on another state of facts, when eyed critically and rightly analyzed.

In this connection Ryerson v. Bathgate, 67 N. J. L. 337, is instructive. The closeness of the questions categorically discussed in the Ryerson case and the singularity of its catalogue of events leading up to the catastrophe, on which the right of action was grounded, possibly justify a quotation at some length, *viz.*:

"The plaintiff owned a domestic cat of which she desired to be rid, and this fact she made known to Silvernail, who (in defendants' employ in a meat shop) told her that the defendants needed a cat, and suggested that she bring it over to them. This she did a few days later, and on arriving at the meat-shop found Silvernail, and also Mr. Swift, one of the defendants. As the plaintiff arrived at the place, the cat jumped from her arms and ran home, whereupon Mr. Swift said, 'You must bring her over later.' Accordingly, a few days later, plaintiff again carried over the cat, and upon entering defendants' premises found Silvernail there alone. As she entered, she told him that he must put the cat in a closet or else she would run away again. Silvernail thereupon walked to the opposite side of the room, opened a door and said, 'Put her in there.' Plaintiff supposed it to be a closet, as she had requested him to put the

cat in a closet. She testified that Silvernail only par-
tially opened the door, 'so that she could just get in
to get the cat in,' and that as he opened the door she
anxiously ran and stooped to put the cat down, and
did not see beyond the door, partly because it was dark
there, and partly because a butcher's frock was hang-
ing on the door. She says that she had the cat in her
arms at the time, and it was scratching at her and she
was anxious to get the cat out of her arms; that she
did not look in, but took it for granted the opening led
to a closet. In fact the door opened upon a flight of
stairs leading down to the cellar, and she stepped in-
side without looking, fell downstairs and sustained in-
juries, to recover damages for which she brought this
action against the defendants. Upon the evidence
above indicated the plaintiff rested her case, where-
upon the court granted the defendants' motion to
nonsuit. To this ruling exception was taken, and the
writ of error brings that ruling here for review.

"From the evidence, the jury would have had a
right to infer that the entrance of the plaintiff upon
the defendants' premises was for their mutual bene-
fit, and not for her benefit solely. Thereupon the
plaintiff invokes the rule of law which was made the
basis of the decision of this court in Phillips v. Li-
brary Co., 26 Vroom 307, and is exemplified in other
recent cases, including that of Furey v. New York
Central and Hudson River Railroad Co., decided by
this court at the present term, viz., that the owner or
occupier of lands, who, by invitation, express or im-
plied, induces persons to come upon his premises, or
to make use of the premises for a given purpose, is
under a duty to exercise ordinary care to render the
premises reasonably safe for such use. The applica-
tion of this rule always depends upon the particular
facts and circumstances of the case under considera-
tion. The owner's liability for the condition of the
premises is only coextensive with his invitation. And

it is incumbent upon the plaintiff to show, not only that her entry upon the premises was by invitation of the owner, but also that at the time the injury was received she was in that part of the premises into which she was invited to enter, and was using them in a manner authorized by the invitation, whether express or implied. So far as Mrs. Ryerson's entry into the meat-shop is concerned, she was undoubtedly within the protection of the rule. The question is whether she was entitled to that protection when she attempted to enter the door that was partially opened by Silvernail. The plaintiff's injury did not result from any defect in the doorway or in the staircase. So far as the case shows, there was no such defect. She was injured because she inferred that the doorway led to a closet, and thereupon attempted to enter without taking observations herself or making further inquiries. Was she justified in doing so?

"The case presents an instance of express invitation. In order to discover its extent, the words used by Silvernail are to be considered with reference solely to the plaintiff's expressed purpose and the act which accompanied his response. She said to Silvernail: 'You must put her (the cat) in a closet or she will run away again.' He said: 'Put her in here,' and partially opened the door. This amounted to a declination of the request that he should take the cat and put it in a closet. It did not even amount to a representation that the place indicated was a closet, in the ordinary acceptation of that term. By what he said and did, he merely represented that the door opened into a place which, when the door was promptly closed again, would securely detain the cat. She had expressed no purpose to enter with the cat. On the contrary, she had notified him that the cat would run away on the slightest opportunity, which carried the inference that it was as important for the plaintiff

to remain outside as it was for her to put the cat inside. The natural thing for her to do was to place the cat through the opening with her hands and then permit Silvernail to quickly close the door so as to detain the cat.

"If he had said, 'This is a closet,' she would have had a right to assume it to be such; but even so, in view of her expressed purpose and his reply, she would have had no right to infer an invitation to enter. If she went in with the cat, the way of exit required for her own withdrawal would necessarily be wider than would suffice for the cat's escape. The cat was confessedly more active than she. If she went in, with the cat in her arms, it would, of course, be necessary for the door to be closed while she released the cat from her grasp. It is quite impossible to see how the plaintiff could then make her exit without permitting the cat to escape, especially if the closet was dark, and, in fact, she had not asked for a lighted one. It is sufficient to say that she had proposed no such round-about programme to Silvernail.

"The case shows that Silvernail formed a correct judgment of the exigencies of the problem, and that the plaintiff did not. He opened the cellar door barely wide enough to enable her to inject the cat according to the approved method, at the same time saying, 'Put her in here.' That was the extent of the invitation. The plaintiff exceeded the bounds of the invitation, and in doing so became a mere licensee. She was injured because she inferred, without warrant, that she might safely enter through the door, and because she thereupon did enter without taking observations herself or making further inquiries of Silvernail. The case rests upon its own peculiar circumstances, in view of which the disposition made of it by the trial court was correct."

The reasoning of Ryerson v. Bathgate would seem to cast liability on defendant in the case at bar on the facts here, which we will now consider.

The unguarded elevator pit in defendant's basement was confessedly dangerous and was so recognized by the management. The pathway to the closet was narrow, irregular, and ran by a wall of piled-up boxes close to the pit. It was so arranged under defendant's directions. Recognizing the danger, incandescent lights were kept burning by the pit, and at another elevator pit in the basement. These lights had been broken a short time before and were out of use. There was testimony clearly indicating that defendant knew, but plaintiff did not, that these lights were broken and out of use. Plaintiff's basement manager testified he discovered the globes were broken the day before in piling boxes and notified Rothschild. True, he said he notified Julius Rothschild and not Albert, the defendant. But as Julius and Albert were partners and as Julius, under the great weight of the evidence, was prone on his death bed at home and had been bed-ridden for weeks, the jury might well infer that the witness was mistaken in the name. Obviously plaintiff did not go to defendant's store for his own convenience, profit or pleasure. He went there under defendant's express invitation to give defendant the advantage of his wisdom in defendant's pending financial transaction. When he got there, he found defendant busy opening his mail and reading his commercial correspondence. Hence, obviously, the ensuing wait on the premises may be referred solely to the business on hand and defendant's convenience. It will not do for defendant to finesse and juggle with the situation thus presented and by overrefinement split it into independent parts. Plaintiff was there in person and his person included mind and body, his legs and feet as well as his head, the trunk of his body and his whole internal *viscera*. Each and all of these component

parts of a human body were within the safe-guards of
the invitation and within the pale of *the laws of hospi-
tality, the laws of nature and the laws of the land relat-
ing to ordinary care.* If, now, plaintiff had said: "If
I must wait then I must have a chair," and defendant
had directed Mr. Stern, his confidential man, to give
him a chair, could it be held that if the chair had a
broken leg or was negligently left weak in the back
and plaintiff by such defects was hurt in using it, de-
fendant would escape liability? If he had said: "My
lungs are oppressed and if I must wait I need fresh
air," and defendant had directed Mr. Stern to take
him to a veranda or a window and the passageway
there was dark and had a pitfall, or the supports to the
veranda were weak or rotten, and plaintiff was harm-
ed, could it be held that defendant was not liable for
the resulting harm? If he had said: "If I must wait
I must have a drink of water to quench my thirst,"
and defendant had directed Stern to point him to the
water jar, could it be held that if he was hurt through
secret defects in a dark passageway to the water jar,
thus pointed out, defendant ought not to respond in
damages? Would all these hypothetical instances be
for the mere convenience and pleasure of the plaintiff
and outside the terms of his license? Clearly not. It
was for the convenience of defendant that plaintiff
waited. As a condition he was entitled to the usual
conveniences attending a *gentleman's* wait, and if he
was invited to use those conveniences, it is sour and
narrow interpretation (is it not?) to say that what was
done was wholly for the convenience and benefit of
the plaintiff. The same may be said of the trip to the
water closet. True, it was Glaser's, not Rothschild's
shoe that pinched—true, the urgent cry of nature came
personally to Glaser, not to Rothschild, but, notwith-
standing that, Rothschild undertook to control and
mold that cry so as to subserve his own business pur-

poses in holding Glaser to the object of his visit and in permitting him to peruse without disturbance or interval his morning mail. The colloquy between plaintiff and defendant, the things that led up to it and produced it, being all usual incidents of a visit and a wait for defendant's good, it follows that the visit to the store, the wait and the visit to the water closet are elements of a single and inseparable transaction, colored by a common and dominating purpose, and such being the case, the law steps in and puts its reasonable construction on what happened in the light of the civilities of civilized life. That construction on demurrer amounts to this: When plaintiff said to defendant (as he did, in effect): "If I must dance attendance until you finish your mail then I need a toilet," and when defendant said in reply (as he did, in effect), "Very well, don't leave the store; Stern, show him ours," and Stern, under the command and eye of his master, took down the key, gave it to him and pointed the way, from that colloquy and invitation arose an implied guaranty from Rothschild to Glaser that the way there was reasonably safe and the closet reasonably fit for use. True, defendant did not use all the words put in his mouth, but what he did say, interpreted by the situation and what went before and after, amounted to what we say he said.

It is apprehended that this holding is within the fair inference of the facts disclosed and is within the fair intendment of the whole body of the law pronounced in the cases discussed by my learned brother in his separate opinion. To the same purport is the late case in Illinois. [Pauckner v. Wakem, *supra.*] Nothing said in the O'Brien case, *supra,* 100 Mo. 182, contravenes the position. In that case the parents sued for the death of their minor son, William, while riding in an elevator for his own pleasure and convenience, which elevator was used in defendant's business only for transporting material. It was held that a pe-

tition charging death from a negligent defect in the plan of construction of the elevator is not supported by proof of death resulting from negligence in its operation. It was held further that where the employee rides on an elevator of the character indicated under an implied license for his own pleasure and convenience he can only require the exercise of ordinary care in its operation, and that the employee in such a case accepts whatever result is incident to the construction and operation of the elevator. The general language of the case must be construed with reference to the facts held in judgment, and so construed it gives no support to the conclusion that Rothschild is not liable to Glaser on the facts of this case.

For the manifest errors in instructions as pointed out in paragraphs one, two and three of our Brother WOODSON's opinion, appended hereto, the judgment is reversed and the cause is remanded to be proceeded with in accordance with this opinion and in accordance with paragraph four in the opinion of *Woodson, J.* *Gantt, Burgess* and *Graves, JJ.*, concur in what is here said. *Woodson, J.*, expresses his view in a separate opinion in which *Valliant, C. J.*, and *Fox, J.*, concur fully, and *Graves, Gantt* and *Burgess, JJ.*, also concur in paragraph four thereof.

## SEPARATE OPINION.

WOODSON, J.—Plaintiff sued defendant in the circuit court of the city of St. Louis to recover the sum of $6,000, damages for personal injuries sustained by falling into the pit of an elevator shaft on the premises of Rothschild Brothers, caused by the alleged negligence of defendant.

There have been two trials of this cause—the first resulted in a verdict and judgment for plaintiff, and upon motion for a new trial the judgment was set aside and a new trial granted, from which order plaintiff ap-

pealed to the St. Louis Court of Appeals, which court affirmed the judgment of the lower court and remanded the cause for a new trial. The second trial resulted in a verdict and judgment for defendant, and after taking the proper preliminary steps therefor the plaintiff appealed the cause to this court.

There is no dispute as to the main facts of the case, but the evidence is somewhat conflicting upon the question of contributory negligence.

The undisputed facts are that Rothschild Brothers, of which defendant was a member, occupied a large building, several stories in height, at the corner of Eleventh and Washington Avenue, conducting a wholesale hat business. The building was located at the southwest corner of the intersection of the said two streets and extended from the south side of Washington Avenue back to St. Charles Street. The building fronted on Washington Avenue. The office was in the corner of the building to the left of the entrance. The remainder of the building with the exception of passageways was filled with boxes usually found in such stores.

The plaintiff was engaged in no business, but devoted his time in looking after his own securities. He was a brother-in-law of Julius Rothschild, one of the members of the firm of Rothschild Brothers.

On the day of the accident Albert Rothschild, the defendant, telephoned the plaintiff that he would like to have him come to the store and see him regarding some securities. Shortly after this call and in pursuance thereof plaintiff went to the store and entered the office and spoke to defendant. At that time defendant was busy opening his mail and requested plaintiff to be seated for a few minutes, until he finished looking over the mail. At that juncture plaintiff, wishing to answer a call of nature, asked permission to use the toilet, which permission was granted. The follow-

ing is the testimony of plaintiff as to what transpired upon that occasion:

"If you (referring to defendant) wish to finish your mail I think I shall have to go to the toilet. He said, 'Very well.' He asked Mr. Stern, who was present, and I believe his confidential bookkeeper, to hand me the key of the toilet, and Mr. Stern walked with me a distance and showed me the way down to the basement." There was a basement to the building, with windows on the Eleventh Street side, and in this basement the toilet was located. The basement was reached by means of the elevator and stairway. There was an excavation about three feet deep in the basement floor for the reception of the lower portion of the elevator when it was lowered to the basement. This excavation was wholly unguarded. The toilet was located about fifteen feet from the foot of the stairway and directly south of and in front thereof. The plaintiff entered the basement by means of the stairway. Upon this occasion there were boxes stacked up in front of the stairs which necessitated plaintiff's walking around the boxes in order to reach his destination. There was a narrow passageway two and one-half feet wide between the boxes and the elevator pit, and plaintiff was walking along this passage when he fell into the excavation and received the injuries complained of in the petition. There was an incandescent lamp located in front of the stairway, but it was not lit upon the occasion in question.

The defendant testified as to the number and location of the toilets and by whom they were used in the following language:

"Q. Now, how many toilet rooms did you maintain in the basement of the premises? A. Three.

"Q. How were they with reference to each other, were they far apart or adjacent? A. They were along side of each other.

"Q. How long a space did the three occupy together? A. I couldn't say, I do not know exactly.

"Q. About how many feet? A. About twelve feet, I think.

"Q. For the three together? A. Yes, sir.

"Q. And they were right next to each other, as I understand you? A. Yes, sir.

"Q. Were they all against the south wall of the building? A. Yes, sir.

"Q. Now, you have stated that Mr. Stern furnished the key to the toilet room to Mr. Glaser, did you see him do that, or did you ask him to do it? A. I asked him to do it.

"Q. Were all three toilet rooms kept locked? A. No, sir.

"Q. How many were kept locked? A. One.

"Q. This one for which the key was furnished to Mr. Glaser? A. Yes, sir.

"Q. And the other two were open? A. Yes, sir.

"Q. What were the toilet rooms used for at the time—by whom were they in use, I mean? A. The two that were unlocked were used by the porters and general help around the store, and the one that was locked was used by the office force and friends of ours that came in to see us, and some of our customers.

"Q. And to these you furnish the key? A. Yes, sir.

"Q. So they could use it? A. Yes, sir."

The plaintiff's evidence tended to show that the basement was poorly lighted with natural light and that the artificial light was not burning at the time of the accident; that in consequence of the poor light, the narrowness of the passageway along which he was walking and its proximity to the unguarded elevator pit caused him to fall therein and inflicted the injuries complained of.

The defendant's evidence tended to show that the basement was well lighted, and that a person standing

at the base of the elevator shaft in front of the pit could see well enough to read the print of an ordinary newspaper.

And on cross-examination the plaintiff was asked the following questions, and he gave the following answers thereto:

"Q. As you went along if you had been looking down at the ground you could have seen the width of that place and could have seen the excavation, and avoided falling into it, if you had been looking? A. If I had looked for that place I would not have fell in.

"Q. If you had been looking down at the ground you could have seen the width of this passageway, couldn't you? A. I don't know exactly what you are trying to get at, I can't answer that; I was not looking for it and didn't see it.

"Q. Now, I am asking you this, if as you walked around there, the edge of the boxes, and saw the boxes, if you had been looking down you could have seen the width of this passageway, if you had been looking for it? A. Possibly.

"Q. Did you see this elevator pit or shaft? A. No, sir.

"Q. Could you really discern it? A. No, sir.

"Q. If you were looking could you see things? A. I did look.

"Q. If you had been looking at that elevator shaft, or towards it, you could have seen it, couldn't you? A. No, sir, on this day it was very dark; if I had seen the elevator hole I would not have dropped in.

"Q. I didn't say that you saw it—I said if you had been looking for it? A. I had no reason to look for it.

"Q. I didn't ask you that either—I said if you had gone down there and had been looking for it you could see it ten or twelve feet ahead of you? A. If I had looked for it, yes, sir.

"Q. The fact is when you got down to the basement there, after walking down those steps, you were preoccupied with something else, or in a brown study, and just walked by those boxes without thinking whether there was an elevator shaft there or not? A. I was not preoccupied with anything at all; I wanted to go to the toilet and this place was dark, and I walked along and fell in, and that is all there is to it, you can't get it any other way.

"Q. If you had been looking for this shaft, which you remember went into the basement, or looking for the pathway that was west of the boxes, you could have seen that? A. I was not looking for it.

"Q. I say if you had been you would have seen it? A. Yes, sir; I suppose so."

At the request of plaintiff the court instructed the jury as follows:

"If the jury believe from the evidence that on or about the 4th day of January, 1901, the plaintiff came to the premises of Rothschild Brothers, at the invitation of the defendant; that the defendant was at said time a member of said Rothschild Brothers; that at said time said Rothschild Brothers maintained a closet or toilet room in the basement of said premises; that, while on said premises as aforesaid plaintiff went to said closet or toilet room with the knowledge and consent of the defendant; that Max Stern, an employee of said Rothschild Brothers, with the knowledge and consent of the defendant, furnished plaintiff the key of said closet or toilet room, in order to enable plaintiff to use said toilet room or closet; that said closet or toilet room was maintained at said time by said Rothschild Brothers for the use of various persons, including visitors; that near said closet or toilet room there was at said time the pit of an elevator shaft, which was about three feet deep; that said pit was at said time without guard or enclosure of any kind; that in going to said closet or toilet room, the plaintiff step-

ped into said pit, and that thereby in consequence thereof his left ankle was disclocated and sprained and his left knee injured; and that the plaintiff was not guilty of negligence directly contributing to his own injury, then the jury will find for the plaintiff.

"2. If the jury find for the plaintiff, they should assess his damages at such sum as they may believe from the evidence will reasonably compensate him for any injury to body and for any pain of body or mind suffered by him in direct consequence of the injury herein sued for, and for expenses, if there were any, for which he became obligated for medical attention in consequence of said injury, the amount included for such expenses, if any, not to exceed the reasonable value of such medical attention, and will not consider any other elements of damage. If your verdict is for the defendant, you will simply so state in your verdict."

And at the request of defendant and over the objections of plaintiff the court gave in its behalf the following instructions:

"1. The court instructs the jury that if you believe from the evidence that at the time the plaintiff sustained the injuries complained of by him there was sufficient light in the cellar for a person of average eyesight to easily see the depression in the floor of the basement, into which plaintiff claims he fell, and if you further believe from the evidence that had plaintiff been in the exercise of ordinary care he would have detected the said depression and would have avoided falling therein, then and in that case the plaintiff can, under no circumstances, recover in this case, and your verdict must be for the defendant.

"2. The court instructs the jury that the law is that even though a person is injured by the negligence of another, such person cannot under any circumstances recover if the injuries complained of by him were directly due, in whole or in part, to any negligence on

the part of the injured person himself; and in this case the court instructs the jury that under no circumstances can the plaintiff recover against the defendant, if you believe and find from the evidence that the injuries complained of by plaintiff were directly due, in whole or in part, to any negligence or want of ordinary care on his part.

"3. By 'ordinary care' as used in these instructions is meant such care as persons of ordinary prudence would exercise under the same or similar circumstances, and by the term 'negligence,' as used in these instructions, is meant the absence of such care.

"4. The court instructs the jury that there is no evidence in this case to sustain the charge in plaintiff's petition that defendant left said basement without light or illumination of any kind.

"5. The court instructs the jury that the plaintiff in this case has testified that had he looked he could have seen the pathway between the boxes mentioned in the evidence and the elevator depression. And the court instructs the jury that if you believe from the evidence that plaintiff in failing to look for said pathway and said depression failed to exercise ordinary care for his own safety; and that said failure on his part directly contributed to cause the injuries complained of by him, then and in that case your verdict must be for defendant."

The plaintiff on his part requested the court to give, but the court refused to give, to the jury the following instructions:

"1. The court instructs the jury that under the pleadings and the evidence they should find for the plaintiff, unless they believe from the evidence that the plaintiff was guilty of negligence directly contributing to his own injury.

"2. The court instructs the jrury that at the time of the accident herein sued for the law required the openings of all hatchways, elevators and well holes

upon every floor in the building in which said accident occurred to be protected by good and sufficient trap doors or self-closing hatches or safety catches or strong rails at least three feet high, and that the plaintiff had the right under the circumstances shown in evidence to presume that this provision of the law had been complied with.

"3. The court instructs the jury that under the facts and circumstances appearing from the undisputed evidence in this cause, the plaintiff, in going to the toilet room or water closet spoken of in the evidence, had the right to presume that the premises through which it was necessary for him to pass in going to said toilet room or water closet were in reasonably safe condition."

To which action of the court he duly excepted.

Counsel for plaintiff has assigned many errors to the rulings of the court made during the progress of the trial, which will receive due consideration in the course of the opinion.

I. The first error urged against the ruling of the trial court regards instruction numbered one given on behalf of respondent.

That instruction, in substance, told the jury that if they believed that at the time of the injury the basement was sufficiently light to enable a person with average eyesight to easily see the pit into which plaintiff fell, and that if they further believe "that had plaintiff been in the exercise of ordinary care he would have detected the depression and would have avoided falling," then the finding should be for the defendant. The objection is directed to that portion of the instruction embraced in quotation marks. Counsel for appellant insists that the quoted words assume that his client did not exercise ordinary care to avoid falling into the elevator pit and was tantamount to telling the jury to find for respondent.

The instruction, in substance, told the jury that if they believe "that had plaintiff been in the exercise of ordinary care" the injury would not have occurred. That was equivalent to telling the jury he could not recover, for the reason that by telling them *that had he exercised ordinary care* he would not have fallen, and then assumes, as the instruction does, that he did fall. That was tantamount to telling them that he was not in the exercise of ordinary care, else he would not have fallen; or, in other words, that his fall was due to lack of ordinary care. To demonstrate: suppose I should say to a man who had fallen in the street, "Had you exercised ordinary care you would not have fallen." Clearly that would have been the same in meaning as if I had said to him, "You fell because you were not exercising ordinary care." The meaning of the words is too clear to give rise for doubt or room for argument; and under that instruction all the jury were required to do in order to find for respondent was to find the conceded fact, that appellant fell into the pit.

This court has many times held that the mere fact that an accident had occurred was no evidence whatever that it was caused by the negligence of the defendant. [Carvin v. St. Louis, 151 Mo. l. c. 345; Yarnell v. Railroad, 113 Mo. 570; Zeis v. Brewing Association, 205 Mo. l. c. 653.]

And we are unable to see any good reason for holding that the same rule should not be applied to the plaintiff. The mere fact that respondent fell into the excavation is no evidence whatever that the fall was due to his failure to exercise ordinary care for his safety. In legal effect the instruction under consideration told the jury that the mere fact that respondent fell was conclusive evidence that he was not in the exercise of ordinary care at the time of his injury, and that on that account he could not recover.

A similar instruction to this was given by the trial court in the case of Coffey v. City of Carthage, 186

Mo. l. c. 583, which on appeal to this court was disapproved and held to be reversible error. That instruction read as follows: "The court instructs the jury that if you believe from the evidence that at the time of the injury the plaintiff was carelessly and negligently walking along the edge of the stone walk mentioned in the evidence, and *failing* to use ordinary care in paying attention to where she was walking," etc., then she could not recover. In discussing that instruction, this court, among other things, said: "While the instruction may impliedly cover the law applicable to the facts of the case, yet, in its present form, it is subject to the criticism that it assumes that if plaintiff had exercised a reasonable degree of care and caution, she could have discovered the defect or hole in the sidewalk and thereby avoided the injury." The instruction in the Coffey case is less obnoxious to the rule against assuming facts to be true which are disputed than is the instruction under consideration.

We are, therefore, of the opinion that the instruction was erroneous and should not have been given.

It is passingly strange that able counsel will ask and that learned courts will continue to give this class of instructions, when they have been so frequently disapproved by this court. If it was not for the constant giving of this class of instructions by the trial court, the appeals to this court would be greatly diminished in number.

II. It is next insisted by appellant that instruction numbered four given on behalf of respondent is erroneous and should not have been given. It told the jury that there was no evidence in the case to sustain the charge in plaintiff's petition that defendant left the basement without light or illumination of any kind. The substance of this instruction constituted one of the charges of negligence stated in the petition.

While appellant's evidence did show, in the language of the instruction, that the basement was "without light or illumination of any kind," yet it did tend very strongly to show that the basement was poorly lighted and was very dark; that he could not readily discern objects therein, and that on account of the darkness he was unable to see the pit into which he fell. If appellant had any legal right to be in the basement, then the respondent owed him the duty to keep it sufficiently light to enable him while in the exercise of ordinary care and by the reasonable use of his eyesight to approach and leave the toilet in reasonable safety. The law did not require him to state in his petition the exact degree of light or darkness that existed in the basement at the time he was injured. Darkness is the absence of light, and when counsel for appellant charged in the petition that the basement was without light of any kind, it was equivalent to stating that it was totally dark. But notwithstanding that allegation in the petition he was not required to prove the basement was totally dark before he was entitled to a recovery. The law only required him to allege and prove that the degree of light was so small, or that the degree of darkness was so great, which mean one and the same thing, that by the reasonable use of his eyesight he was unable to see the pit into which he fell, and that in consequence thereof he fell therein.

A good pleader in this class of cases would not attempt to state the exact degree of darkness that existed, even if it were possible to do so, but would place it great enough to be sure he was stating a good cause of action, and depend upon the testimony to make out the proper degree thereof to make out his case. That was what was done in the case at bar. He charged that the basement was totally dark, and introduced testimony tending to show the degree of darkness was so great that an ordinarily prudent person by the reasonable exercise of his eyesight was unable to discover

the pit complained of. The most that can be said against that allegation of the petition is that it is redundant as to the degree of the darkness stated therein. But that in no manner worked injury or prejudice to respondent. The instruction, however, does not so inform the jury. It in broad, sweeping terms told the jury that there was no evidence whatever to sustain the charge in the petition, and thereby withdrew it from their consideration. The giving of that instruction was clearly erroneous.

III. Appellant's third assignment of error is lodged against instruction numbered five given on behalf of respondent. That instruction in effect told the jury that plaintiff testified that had he looked he could have seen the passageway between the boxes and the elevator pit, and that if they believe that such failure contributed to his injury then they would find for the defendant.

In the statement of this case we have set out in full all of appellant''s testimony bearing upon the question in hand and upon which this instruction is based. In our opinion counsel for respondent and the learned court who tried the cause minsunderstood that evidence. When his entire testimony upon that subject is considered then there is nothing contained therein which warrants the statement that appellant testified that had he looked he could have seen the passageway and the elevator shaft. If we pick out some isolated sentences, disconnected from their context, such a conclusion might be reached; but when the testimony is read in the order given and in connection with the matters under investigation, then no such conclusion can be reasonably drawn therefrom. The substance and meaning of his evidence upon that question was that he did look; that he saw the boxes, elevator shaft and passageway; that the darkness of the basement prevented him from seeing the elevator pit; that had he

known it was there and had he been looking for it, the light might have been sufficiently strong for him to have seen it; but having no knowledge of the existence of the pit and no occasion to look specially for it he did not see it on account of the poor light. In our opinion this is the plain meaning and effect of appellant's testimony, and is in direct conflict with what the court told the jury he had testified to. The instruction was, therefore, clearly wrong and should not have been given.

IV. It is also insisted by counsel for appellant that the trial court erred in refusing to give instruction numbered two asked by him. That instruction reads as follows:

"2. The court instructs the jury that at the time of the accident herein sued for the law required the openings of all hatchways, elevators and well holes upon every floor in the building in which said accident occurred to be protected by good and sufficient trap doors or self-closing hatches or safety catches or strong rails at least three feet high, and that the plaintiff had the right under the circumstances shown in evidence to presume that this provision of the law had been complied with."

It is contended that the following statute enacted in 1891, Laws 1891, p. 159, sec. 5, the same being section 6435, Revised Statutes 1899, made it the duty of respondent to place guards around or in front of the elevator pit in question. Said statute reads as follows:

"The openings of all hatchways, elevators and well-holes upon every floor of every manufacturing, mechanical or mercantile or public building in this State shall be protected by good and sufficient trap doors or self-closing hatches or safety catches, or strong guard-rails three feet high, and all due diligence shall be used to keep such trap doors closed at all

times, except when in actual use by the occupant of the building having the use and control of the same.''

This contention of appellant is denied by counsel for respondent; and they insist that said section 5 of the Act of 1891 should be read and construed in connection with the title of the act and the various other sections thereof, and that when so construed it will clearly appear that it was enacted for the protection of the health and safety of the employees of the institution mentioned therein and not for the protection of others.

There is no better settled rule of construction than the one which requires the court to read all acts and statutes relating to the same subject-matter, briefly called statutes *in pari materia,* and construe them together and gather from all of them the legislative intent. [Sales v. Barber Asphalt Paving Co., 166 Mo. l. c. 677 and 678.]

There are twenty-eight sections in the act mentioned, and by reading them it will be seen that each and all of them, excepting sections 5 and 19, which in any manner refer to the persons for whose protection they were enacted invariably refer to the employees of the institutions therein mentioned. Section 5 requires that the openings ''of all hatchways, elevators and well-holes upon every floor of every manufacturing, mechanical or mercantile or public building in the State shall be protected by good and sufficient trap-doors or self-closing hatches or safety catches or strong guard-rails at least three feet high.''

In our opinion the buildings mentioned in section five are the same buildings mentioned in section 1 of the act, which are referred to as ''all factories,'' etc., for the reason that the express object of the act was to protect the health and safety of the employees working therein by requiring the things to be done which

221 Sup—14

are stated in the various sections of the act, and by commanding frequent and thorough inspections to be made thereof by the building inspector. The manifest purpose of the Legislature was, not only to require that the buildings should be made safe and sanitary, but that they also should be maintained in that condition. This is clearly manifested by requiring frequent inspections to be made of them and the imposition of heavy fines and penalties for violations of the provisions of the act. If the buildings mentioned in section 5 are not the same as those mentioned in section 1, then there is no law upon the statute books requiring that the great mercantile and mechanical institutions of the State be inspected or maintained in a sanitary condition after they are once placed in that condition; nor would the owners or managers thereof be subject to the fines and penalties prescribed by the act if the buildings mentioned in the two sections are not the same. It is not to be presumed that the Legislature intended that the buildings mentioned in the two sections should be placed in a safe and sanitary condition, and that only those mentioned in the first section, to-wit, factories, should be so maintained; but that would be the exact status of the law if the contention of counsel for appellant is correct.

The effects and consequences of a proposed interpretation of a law should be considered in trying to ascertain the intention of the Legislature. [State ex rel. Macklin v. Rombauer, 104 Mo. 619; Kane v. Railroad, 112 Mo. 34.]

If we adopt appellant's interpretation of section 5, then we must hold that the Legislature intended that the buildings mentioned in that section were not to be inspected and maintained in a safe and sanitary condition, notwithstanding the fact that the first class of buildings mentioned therein are "manufacturing" establishments, but that those referred to in section 1 should be. Learned counsel for appellant has not point-

ed out and we have been unable to see any good reason
which could have prompted the Legislature in making
that important distinction regarding the two classes
of buildings.

Again, if counsel for appellant is correct, then
there is a clear conflict between section one and five
of the act, for the reason the first provides for the
equipment and inspection of all factories employing
more than ten persons, while under section five no.
"manufacturing" establishment would be required to
be so equipped and inspected, because the word
"manufacturing" is clearly a factory within the mean-
ing of that word as used in the first section.

But counsel urges that section 19 of the same act
lends force and effect to his position and militates
against that taken by counsel for respondent. That
section provides that all scaffolds or structures used
in or for the erection of buildings shall be so con-
structed as to "insure the safety of persons working
thereon, or passing under or about the same, against
the falling thereof or the falling of such materials or
articles as may be used, placed or deposited thereon.
All persons engaged in the erection, etc, of any build-
ing shall exercise due caution and care so as to pre-
vent injury or accident to those at work or near by."

The wording of this section is general, and if read
in its literal sense it is broad and comprehensive
enough to embrace all persons who are at work upon
the building, and also all persons who might be "near
by" whether working or not; but when we read this
section in connection with the entire act, as we did sec-
tion 5, then we are of the opinion that the persons re-
ferred to by the words "all persons who might be near
by" mean all employees who might be near by.

The law is well settled that doubtful words of a
statute may be enlarged or restricted in their meaning
to conform to the intent of the law-makers when mani-
fested by the aid of sound principles of interpretation.

[State ex rel. v. Field, 112 Mo. 554.] The authorities hold that a statute should not be construed as if it stood solitary and alone, complete and perfect in itself, and isolated from all other laws. It is not to be expected that a statute which takes its place in a general system of jurisprudence shall be so perfect as to require no support from the rules and statutes of the system of which it becomes a part, or so clear in all its terms as to finish in itself all the light needed for its construction. [Humphries v. Davis, 100 Ind. l. c. 284.]

Under that rule, where the language of a statute leads to a manifest contradiction of the apparent purpose of the enactment, a construction may be placed upon it which will modify the literal meaning of the words thereof. [Cole v. Skrainka, 105 Mo. 303.]

We might also add in this connection that under the provisions of our Constitution the title of a statute is necessarily a part thereof, and in construing the statute we should take the title into consideration, also. In discussing this question in the case of Dart v. Bagley, 110 Mo. 42, this court, speaking through GANTT, J., said:

"There are many canons of construction, but they all rest upon the common principle that if possible the intention of the Legislature must · be ascertained. These rules are only valuable when they subserve this purpose. One of these rules of construction, long established in England, was that 'the title cannot be resorted to in construing the enactment.' [Hunter v. Nockolds, 1 McN. & Gord. 651.] But in this State and others, where the Constitution gives a peculiar significance and assigns particular importance to the title by requiring that a statute shall contain but one subject, 'which shall be clearly expressed in its title,' this common law canon is clearly at variance with our methods of interpretation. On the contrary we hold that the title is necessarily a part of the statute and

aids in and is a necessary guide to its right construction. [Endlich on Interpretation of Statutes, secs. 58, 59 and cases cited.] So it was said in Conn. Mut., Life Ins. Co. v. Albert, 39 Mo. 181: 'But the better rule, as we think, is to presume that the true intent and meaning is to be found in the title, unless it is plainly contradicted by the express terms of the body of the act.' "

The title of the Act of 1891 is as follows: "INSPECTION: HEALTH AND SAFETY OF EMPLOYEES. An Act relating to manufacturing, mechanical, mercantile and other establishments and places and the employment, safety, health and work hours of employees." Then follow twenty-eight sections of the act, the first section of which creates the office of Factory Inspector, defines his duties and provides what buildings shall be inspected. The act then provides by section after section what the owners and managers of those buildings, namely, manufacturing, mechanical, mercantile and other public buildings in the State, shall do in order to protect the life and health of their employees, namely, erect and maintain guards around belting and shafting, post notices warning their employees of certain dangers, the placing of doors or gates in front of elevators and hatchways, the erection of fire escapes and doors of exit from buildings, to paint work rooms, to provide suitable facilities for washing and dressing, separate water closets for the sexes, proper ventilation, seats for females, fans to prevent smoke and dust, and prescribes the character of basements and back houses in which persons are required to work, notice to be given to inspector where factory is used for sleeping apartments, the requirements for sleeping apartments, to furnish scaffolds to be used in construction of building, to furnish platforms, passageways, steps, flag offices in and around railroad yards. The act also prohibits women and minors from cleaning machinery while in motion, the storage of explosive

or inflammable material so as to endanger the lives of employees and over-crowding the buildings in which they work. The remaining few sections of the act relate to the duty of the inspector, his deputies, prosecuting attorneys and the fines to be imposed for the violation of any of the provisions of the act and what fund they shall go to when collected.

As before stated, not only does the title of the act, but also each and every section of the act itself, save sections 5 and 19, wherein the persons are mentioned for whose protection the act is intended refer in express terms to employees, while 5 and 19 are perfectly silent as to whom they refer to.

If we read sections 5 and 19 in the light and meaning of the foregoing rules of construction, then we are forced to the conclusion that they refer to and embrace the employees working in the buildings mentioned in the title and other sections of the act, and do not embrace and extend its protection to any one person or thing.

There is nothing in the case of Parker v. Barnard, 135 Mass. 116, cited by counsel for appellant, in conflict with anything stated herein. Both the title of the statute and the statute itself in that case were general in their terms and applied to all persons and were not limited to employees alone, as does the statute involved in the case at bar.

Evidently this is the view the Legislature has taken of this act, for it has enacted various other laws for the inspection and protection of the health and safety of persons working in mines, guests in hotels and occupants of other public buildings.

We are, therefore, of the opinion that the court properly refused to give appellant's refused instruction numbered 3.

V. Counsel for respondent finally insist that the judgment is for the right party, as disclosed by the whole record in the case, and that it should not be disturbed even though we should sustain all the errors assigned and presented by counsel for appellant. This contention presents a more serious proposition for our determination and brings us to the consideration of the real merits of the case.

Respondent contends that the appellant was a licensee upon the premises at the time he sustained the injuries complained of, and that he owed appellant no duty whatever to look after his safety, except not to intentionally or wantonly injure him; and that there is no evidence contained in the record tending to prove that exception. While upon the other hand counsel for appellant contend that he was an invitee of respondent at the time he received his injuries, and that the latter owed him the duty of seeing that he was not negligently injured while upon his premises. These respective contentions sharply present the main legal proposition involved in this litigation.

In order to properly understand the respective contentions of counsel we should bear in mind the meaning of the words "licensee" and "invitee," but as their meaning is so well known it would be useless to give their technical definitions here. It will suffice to say that a licensee is one to whom a license has been given, that is, a permit or authority to do that which he otherwise would not have the right or authority to do. And the word invitee may be defined to be a person to whom an invitation has been extended. That invitation need not necessarily be extended in express words; it may be given by implication by way of allurement, inducement or enticement of any kind. From these definitions it is readily seen that the license is granted for the presumed benefit of the licensee, and authorizes him to do that which he otherwise would not have done; and that the invitation is extended for

the benefit or pleasure of the invitor, or for the mutual benefit or pleasure of the invitor and invitee.

It should also be borne in mind that before it can be held that respondent owed appellant any legal duty, it must be first shown that the latter at the same time had the legal right to have that duty performed by the former.

The question now is, did that right and duty exist in this case at the time of the injury? That question must be solved in the light of the evidence in the case as disclosed by the record. In brief, it is substantially as follows: Respondent was a member of the firm of Rothschild Brothers, wholesale hat dealers, occupying a large building several stories in height, with basement beneath. The basement was reached by means of a stairway and by an elevator. At the foot of the elevator shaft there was an unguarded excavation about three feet deep for the reception of the lower portion of the elevator, and when lowered the floor of the elevator was on a level with the floor of the basement. The stairway decended from the north, and the toilets, three in number, were some fifteen or twenty feet directly south thereof. The elevator was west of a line drawn from the west side of the stairway to the west side of the toilets and opened to the east. On the day of the accident there were some boxes piled up in front of the stairway and between it and the toilets, leaving a passage-way of only about two and one-half feet between the boxes and east side of the excavation. Two of the toilets were opened and were intended for and were used by the various employees of the firm, and the other one was kept under lock and was intended for the use of the members of the firm, and the managers thereof, and was used by them, and occasionally by some of their customers, who first got permission from some one in the office. They had to be furnished the key thereto in order that they might unlock and enter the same. The office of

Glaser v. Rothschild.

the firm was on the floor above the basement, and the toilet was far removed therefrom and was not visible therefrom, and when outsiders requested to use the toilet they had to be shown its location. The elevator was standing at some one of the floors above the basement. The foregoing was the condition of the premises at the time appellant entered the office of the firm.

He went to the office in pursuance to a request of the respondent, who wished to consult him about some securities. At the exact moment when appellant entered the office the respondent was busy with opening his mail and requested appellant to be seated for a few moments. Instead of being seated he said he would have to answer a call of nature, and requested that he be permitted to use the toilet. Upon his desire being made known, the respondent instructed Mr. Stern in the office to get the key and show him the toilet. In response to the instruction the key was procured and appellant was shown the way to reach the toilet. Upon receiving the key and instruction he proceeded down the stairs and in passing between the boxes and excavation he fell into it and received the injuries complained of. And appellant testified that the basement was poorly lighted and that the passage-way so narrow and dark that a person though exercising ordinary care might fall into the excavation; and that at the time of his injury he was looking the best he could where he was going, along the passage-way.

This evidence conclusively shows and counsel for respondent concede that appellant was an invitee when he entered and while he remained in the office of the firm, but that when he asked permission to use the closet and left the office he then became a licensee and ceased to be an invitee. Counsel for appellant upon the other hand denies that contention and insists that he remained an invitee all the time he was on the premises, for the reason he was still there in response to the respondent's invitation and had not at the time

of the injury transacted the business for which he was called.

Which of these two contentions is sound? In our opinion the first correctly states the law of the case. Appellant did not leave the office at the request or invitation, either expressed or implied, of the respondent, nor did he go upon business or pleasure of respondent. The latter did not request, induce, entice or in any manner allure the former to leave the office or retire to the toilet room. While upon the other hand the uncontradicted evidence shows appellant was taken short by a call of nature and requested the use of the toilet. That permission was granted. He was licensed to use the toilet, a right he did not have until it was granted to him, and that is conclusively shown by the fact that it was kept under lock, and that neither he nor any one else could use it without first obtaining permission to so do and receiving the key with which to unlock the door. He was on a mission of nature for his own comfort and pleasure as well as the good of his health. That was a matter in which respondent had no legal interest—at most, a feeling of interest for a fellowman who was in distress, and like any good man prompted by the instincts of humanity readily and properly granted the request.

If he had the legal right to the use of the toilet, why did he ask permission to do so? and, if that was true, why was it kept locked from him and all others outside of the office force? The mere fact that he was furnished the key to the door was notice to him that it was a private toilet and not intended for him or the general use of all who had or might have business with the firm or the members thereof.

The mere fact that he entered the office in response to an invitation to transact a business matter would no more carry with it the implied right to use the private toilet of the firm than it would carry with

it the right to go to the roof of the building in order that he might view a passing pageantry.

It would be no less startling than novel for this court to hold that an invitation to enter a business office for the purpose of transacting a specific matter of business would carry with it an implied invitation to enter all portions of the premises, however large or far removed they might be from the office, and there transact any and all business matters which might be conducive to the fortune, comfort or pleasure of the invitee. Yet the legal effect of appellant's contention, if upheld, would lead to just that result, for there is no more connection between the one than there is in the other. In neither case would the one be the incident to the other. But it is argued that if the use of the toilet had been refused, the appellant would in all probability have left the office and would have refused to transact the business for which he was called. Concede that to be true, yet that fact would no more impose a duty upon respondent to furnish a safe passage-way to the toilet than it would have imposed a duty upon him to furnish appellant a safe bed upon which to recline while waiting, had he requested permission to use a bed located upon another floor of the building. In both cases the request was for the sole comfort and pleasure of appellant and wholly disconnected with and independent of the business for which he had been called. The only distinguishing feature existing between the two cases is the fact that one was a very reasonable request, while the other under ordinary conditions would have been an unreasonable request; yet we can conceive a case where both would have been equally reasonable, for instance, where a person had been suddenly taken sick. In the latter case it would with equal force and plausibility be contended that if the use of the bed had been refused he would have left the office and would have declined to transact

the business, yet that fact would not impose a duty to furnish the bed.

The foregoing observations are supported by and are in harmony with the views expressed in the following cases cited by counsel for respondent.

In O'Brien v. Western Steel Co., 100 Mo. 182, the defendant maintained a manufacturing plant in which it operated a freight elevator. For some months previous to the time of the accident the elevator in question was frequently and continuously used by the defendant's employees in going from one floor to another. The elevator was a double one, having two cages, one going up as the other came down. At the time of the accident the workmen on the several floors were, by an arrangement of their own, furnished with ice to go into their water, at their own instance. The plaintiff and his comrade had made an arrangement for their ice water with the workmen on the fourth floor. On the night of the accident the plaintiff and his comrade had gone to the fourth floor for a drink of water, as they had done for about a week before the accident. After getting their drink they remained on the fourth floor about ten minutes, then entered the cage, gave the signal for lowering, and as they descended the plaintiff stepped aside and near the edge of the platform, next to the opening on the first floor, his comrade just behind him. When they had passed the arch or the opening of the first floor, the plaintiff leaned forward, ejecting his head about three inches into the archway, preparing to step off when the cage should reach the ground floor. When the platform of the cage reached within about eighteen inches of the ground floor, its motion was suddenly reversed and the cage went up, catching the plaintiff's head between the platform and the arch. The court in passing on the question as to whether the defendant owed the plaintiff any duty in connection with the structure of the said freight elevator, uses the following lan-

Glaser v. Rothschild.

guage: "BRACE, J.—He was on the elevator, not as an employee of the defendant, discharging duties within the scope of his employment, but had passed under an implied license for his own pleasure and convenience; he was familiar with its construction and operation, and when he went upon it accepted whatever risk there was incident to such construction and operation. It did not become the duty of the defendant to change either the one or the other by reason of the fact that the deceased and other employees of the defendant, for their own convenience, were impliedly permitted to ride upon it, such implication arising solely from the fact that they so used it without remonstrance. The only duty that such use could impose upon the defendant would be to operate its elevator in its business with ordinary care in view of such use; and failure to so operate it would be an act of negligence and a breach of duty for the consequences of which the defendant may be held liable."

In Reardon v. Thompson, 149 Mass. 267, the general law is thoroughly discussed and defined as follows, by HOLMES, J.: "No doubt a mere licensee has some rights. The land-owner cannot shoot him. It has been held that the owner would be liable for negligently bringing force to bear upon the licensee's person, or by running him down without proper warning. . . . But the general rule is that a licensee goes upon the land at his own risk, and must take the premises as he finds them. An open hole, which is not concealed otherwise than by the darkness of night, is a danger which a licensee must avoid at his peril."

In McGill v. Compton, 66 Ill. 327, it was held that, where two persons owning an adjoining tract of land, not separated by any division fence, for the purpose of avoiding the expense of erecting and maintaining such a fence, mutually agreed that the stock of each might pasture in the fall of the year on the land of the other, the agreement, in the ab-

sence of a special contract to that effect, imposed no liability on the parties to protect from injury the stock of one while on the land of the other, and where there was a slough well on the premises of one, around which there was no protection, and a horse of the other fell into the same and was drowned, the owner of the well was not liable for the injury.

In Stevens v. Nichols, 155 Mass. 472, the defendants opened a private way into a public street, without putting up signs or notifying travelers that the passageway was not a public way, and the plaintiff, who was not shown to have any right in the passageway, unless as one of the public, while on his way to premises beyond those of defendant, was injured by driving over a curbstone in the passageway, hidden by snow, no active force being used against him, and it was held that plaintiff was at most but a licensee, and went upon defendant's land at his own risk.

In Converse v. Walker, 30 Hun (N. Y.) 596, where one took refuge in a public hotel to escape a storm, together with others attending a fair on the adjoining grounds, and the piazza of the hotel above the room in which plaintiff was gave way by reason of the great weight upon it, injuring the plaintiff, it was held that there was no actionable negligence on the part of the defendant.

In Benson v. Baltimore Traction Co., 77 Md. 535, a teacher asked defendant for permission to bring her pupils into the machinery building and show them the working of the machinery. The defendant consented and the teacher and pupils went by permission of the corporation to visit the power house and machinery. While so doing one of the children was injured. It was held that they were but mere licensees and the defendant owed them no duty whatever in connection with keeping its premises in a reasonably safe condition.

In Sterger v. Van Sicklen, 132 N. Y. 499, plaintiff was on premises adjoining her own, seeking her children who were accustomed to play there, she was injured by the breaking of a decayed stairway; held that she could not recover from the owner of such premises, on the ground that he negligently permitted the stairs to remain in an unsafe condition, because she being on the premises without invitation, and as a mere licensee, the owner owed her no duty of protection.

In Heinlein v. Railroad, 147 Mass. 136, it was held that if a person enters a railroad station in the evening to take a train, and after finding that the last train has gone, remains therein for his own convenience several minutes longer, during which the station-master, the usual closing time having arrived, puts out the lights, he becomes at most a mere licensee and cannot recover for injuries sustained in leaving the station by reason of the extinguishment of the lights. The court says: "In order that it may be held that thereafter the defendant owed any duty to him, it should be shown not merely that it or its servant acquiesced in his remaining and permitted it when his only possible business had been concluded, but that it was in accordance with their invitation, or with the intention and design with which the waiting-room was prepared to be used."

In Metcalfe v. Cunard Steamship Co., 147 Mass. 66, a person, wishing to consult a surgeon whom he erroneously supposed to be attached to a foreign steamship, about bringing his family to this country, went to its wharf on a day of the week other than that when it was open to the public in the gate keepers' discretion, and upon finding the gate open went in with a companion without objection and reached her deck by freight gangway. There a supposed officer met them, who said: "Well, gentlemen?" and who, after the reply, "Good day, please direct us to the doctor's cabin," pointed along a covered passageway, saying,

"Go along that passageway and it is a little beyond the end of it." Thereupon he followed his companion along the passageway, and as he was emerging therefrom he turned his head and almost immediately was struck in the back and knocked into the hold by a bag of flour about to be lowered through an adjoining hatch at which the vessel was being loaded. It was held that the plaintiff was a mere licensee, if not a trespasser, and that he could not recover of the owner of the vessel for injuries thus sustained.

In Railroad v. Griffin, 100 Ind. 221, it was held that where one merely permits others, for their own accommodation, to pass over his lands, he is under no legal duty to keep them free from pitfalls or obstructions which may result in injury. The court in said case says: "The owner of premises is under no legal duty to keep them free from all pitfalls or obstructions for the accommodation of persons who go upon or over them merely for their own convenience or pleasure, even where this is done with his permission. In such case the licensee goes there at his own risk, as has often been said, and enjoys the license with its concomitant perils."

In Severy v. Nickerson, 120 Mass. 306, a laborer employed in loading ice on board a vessel from the wharf, after finishing his work, went on board the vessel for the gratification of his curiosity, and there fell down an open hatchway and broke his leg. It was held that he was a mere licensee, and that the owners of the vessel were not liable for the injury.

In Sweeny v. Railroad, 92 Mass. 372, the court says: "So a licensee who enters on premises by permission only, without any enticement, allurement or inducement being held out to him by the owner or occupant, cannot recover damages for injuries caused by obstructions or pitfalls. He goes there at his own risk and enjoys the license subject to its concomitant perils."

In Parker v. Portland Publishing Co., 69 Mo. 173, a person went to a newspaper office to have a notice inserted in the paper. Being very late at night, the counting room on the first floor was closed, and the plaintiff attempted to go upstairs to the editorial room. The hallway being dark, plaintiff fell into an elevator shaft. The court held that ordinary care and diligence must be used to keep business places and the usual passageways to them safe for the access af all persons coming to them at all reasonable hours, by their invitation, express or implied, or for any purpose beneficial to them; but that no duty is owed to a mere licensee, and that the plaintiff in this case in going to the portion of defendant's building in question was a mere licensee and that no duty was owed him.

In Faris v. Hoberg, 134 Ind. 269, plaintiff went into defendant's store without invitation upon the part of the defendant and solely on plaintiff's own business, and fell into an elevator shaft. It was held that the defendant could not be held liable for negligence, as plaintiff could only be regarded as a licensee. The court says: "The owner or occupant of premises is not under any legal duty to keep them free or safe from the danger of obstruction, pitfalls, excavations, trapdoors or openings in floors for persons who go upon, into or through the premises, not by his invitation, express or implied, but for their own pleasure or convenience, though by his acquiescence or permission, and who, therefore, are mere licensees. Such a person enjoys a license subject to the attendant risks. . . . Judge Charles A. Ray, formerly of this court, in his excellent work on Negligence of Imposed Duties, says: 'The keeper of a public place of business is bound to keep his premises and the passageway leading to and from them in a safe condition, and use ordinary

221 Sup—15

care to avoid accidents or injury to those properly entering upon his premises on business. But this rule only applies to such parts of the building as are a part of or used to gain access to, or constitute a passageway to and from the business portion of the building; and not to such parts of the building as are used for the private purpose of the owner, unless the party injured has been induced by invitation or allurement of the owner, express or implied, to enter therein.' "

In Pierce v. Whitcomb, 48 Vt. 127, plaintiff and defendant were farmers. Plaintiff went to defendant's late in the evening to buy six bushels of oats. Defendant had no oats to sell, but yielding to plaintiff's importunity he consented to sell him the oats to accommodate him. Defendant always kept his granary locked, but he obtained the key and went with the plaintiff to the upper floor of the granary, where the oats were, and while defendant stepped back to get a measure, plaintiff walked about the floor in the dark and fell through an aperture and was injured. Held that he was a mere licensee and could not recover.

The St. Louis Court of Appeals in passing upon this case when before that court on first appeal deliverd a most learned and exhaustive opinion, reviewing many of the leading cases in this country treating of this subject, and reached the same conclusion we have here reached. See 106 Mo. App. 418. The record in the case now is not materially different from what it was when the case was before the Court of Appeals, except the amended petition injected into it the Act of 1891, hereinbefore discussed, and an attempt to show the toilet was maintained for the use of the firm's customers and that all such had the right to use it whenever they saw proper to so do without license. That question we must also decide against appellant.

We, therefore, hold that appellant did not have the legal right to use the toilet at the time he was in-

jured, and, consequently, there was no duty resting upon respondent to keep the passageway in safe condition in so far as appellant is concerned. The one is the corollary of the other. The permission granted was but a naked license and appellant used it at his peril.

In my opinion the judgment was for the right party, and should be affirmed. *Valliant, C. J.,* and *Fox, J.,* concur *in toto.* All concur in paragraphs one, two and three of this opinion. All concur in paragraph four except *Lamm, J.,* who stands *dubitans.* As to paragraph five a majority concur with *Lamm, J.,* in a separate opinion preceding this.