NELLIE WYATT, BY, ETC., APPELLANT, v. KANSAS CITY TERMINAL RAILWAY COMPANY, RESPONDENT.—74 S. W. (2d) 51.

Kansas City Court of Appeals. July 2, 1934.

*Allan R. Browne* and *Benj. W. Grover* for appellant.

*S. W. Sawyer, John H. Lathrop* and *James F. Walsh* for respondent.

TRIMBLE, J.—In this appeal the action is by a minor, who is now a widow, suing for damages for the death of her husband alleged to have been caused by the negligence of the defendant railway company and J. R. Quigg, the railway company's "roundhouse foreman." Originally, and up to the close of plaintiff's case in chief, her prayer was for damages in the sum of $10,000, but she then, by leave of court, amended said prayer by asking for only $7,500.

Thereafter, and before the case was submitted to the jury, the court, over the objections and exceptions of plaintiff, and at the request of both defendants, gave instructions directing the jury to return a verdict for them and against the plaintiff, for the reason that she "is not entitled to recover." Thereupon, and before this instruction was acted upon, the plaintiff took an involuntary nonsuit with leave to move to set aside. This motion was duly filed and overruled, whereupon the plaintiff, in due and proper form, appealed.

The alleged negligence and the death of plaintiff's husband occurred on November 2, 1931, in the private railroad yards of the defendant Terminal Railway, located just west of Southwest Boule-

vard at or near Twenty-seventh Street in Kansas City, Missouri. The yards occupied a large area, near the south end of which was a roundhouse for engines with a machine shop in the north end or portion of said roundhouse. A large number of railway tracks extended in a northerly direction from the roundhouse, but in railroad parlance this direction would be termed north and south. About 300 feet north of the roundhouse, a "cinder pit" began and extended on north for a distance of 300 feet. It was about twenty feet wide and eight feet deep. The bottom and sides of the pit were of concrete except near the top where, from the top of the ground, brickwork sloped, at an angle of forty-five degrees, down to water kept in said pit for the purpose of extinguishing hot or burning cinders, coals or ashes dumped from engines, which passed over each side of said pit lengthwise, on their way to the roundhouse. A railway track passed along each side of the pit, so constructed that the inner rail of each of said tracks was out over the water in the pit for a distance of nearly half the width of said tracks, which were of standard gauge. Between the two inner rails of said tracks alongside and partly over said pit there was an open pool of water in the pit, the width of which is the distance between said tracks, wider than a standard gauge railway track, in fact there is evidence that it was ten feet. At the ends of the pool between the two inner rails were iron grates extending out from the ends of the pool about fifteen feet, consisting of "about three-eighths or one-half inch iron set up on edge." (The photographs of the pool do not disclose these gratings and we cannot give any better or clearer statement of how they were located or what office they performed.)

The plaintiff's husband, as may be surmised, was drowned in said pool or cinder pit, some time between ten-thirty A. M., when deceased was last seen, and four-thirty P. M., when his body was discovered therein. No one saw the occurrence, but it happened in the daylight of a bright, clear day.

Plaintiff's amended petition on which her evidence in chief was heard, alleged that—

" 'Deceased' was about the business of delivering box lunches for employees of defendants, with the knowledge and consent of defendants and at their invitation, and was for that purpose upon the premises controlled and supervised by defendants with their knowledge and consent, and invitation, he was caused to fall into and get into a cinder pit filled with water and cinders and other substances unknown to plaintiff, and on account of the negligence of defendants as hereinafter set forth, was caused to get into and fall into said cinder pit on the property of defendants above set forth, . . . and was thereby drowned and strangled causing the death of deceased."

The negligence thus alleged in general terms was immediately thereafter more specifically stated as follows:

"Defendants negligently failed and neglected to exercise ordinary care under the circumstances to provide a reasonable warning or reasonable barrier or reasonable guard or reasonable protection or reasonable signal of any kind or character whatsoever so as to reasonably warn deceased or those walking on the above property of the danger of said open cinder pit, although defendants knew or by the exercise of ordinary care under the circumstances could have known that said open cinder pit without guards or warnings was dangerous and that deceased and persons walking on said property near or at said cinder pit were likely to fall therein and be injured or killed, . . .

"Defendants were further negligent in that they negligently failed to warn deceased of the dangerous condition of said cinder pit and apprise him of the fact that said cinder pit was unprotected and that he was likely to or might fall into it and thereby be injured or killed.

"Each of the above negligent acts or omissions of defendants jointly cooperated as the sole proximate cause of the death of deceased."

The separate answers of defendants each contained a general denial, together with a plea of contributory negligence couched in these words:

"Deceased, King Dalton Wyatt, knew of said cinder pit or saw, or, by the exercise of ordinary care, could have seen said cinder pit before getting into a position where he would get into or fall into said cinder pit, and states that he either got into said cinder pit intentionally or negligently failed to look out for the same and thereby got into or fell into said cinder pit, and said negligence of the deceased caused or contributed to his death in whole or in part."

The reply was a general denial.

It was agreed that the death of plaintiff's husband occurred on the property of the Kansas City Terminal Railway Company, and that he was drowned.

The evidence first offered in plaintiff's behalf was that of Peterson, an employee in the yards of the defendant railway. He testified that in November, 1931, he was, and still is, working for said company under defendant Quigg, the foreman in charge of the roundhouse and grounds, including the cinder pit. Witness testified that he knew plaintiff's husband, King Wyatt, "the little fellow with the arm off," before he died; that Wyatt brought to him in the yards lunches made by the United Box Lunch Company, which Peterson bought of him for twenty cents each and resold them to the men in the yards for twenty-five cents each. The defendant company had built an ordinary icebox with two locks thereon, one of which witness gave to Wyatt. The icebox was to keep these lunches in. Wyatt had

been delivering these lunches in the yards for about a year before his death. Mr. Quigg, witness supposed, knew about that; he never asked him particularly, but Quigg had been present when these box lunches were brought in by Wyatt and no one objected or ordered him off.

Witness recalled the day King Wyatt drowned. It was about the second of November, 1931. The day was Monday, the plant was open and working. He saw Wyatt about ten-thirty A. M. Witness was east of the cinder pit about the fourth track over, counting the two tracks on the cinder pit. The cinder pit and the tracks, parallel and about the same way as Southwest Boulevard, lay in a somewhat northeast and southwest direction, though more nearly north and south, it seemed to the witness. The Boulevard was east of the cinder pit, and the roundhouse was about 300 feet from the south end of the cinder pit. Witness did not know the length of the cinder pit, but said that "over all it is about twenty feet wide over both tracks" with "a space of ten feet between the two tracks." Witness further testified to a parking place for automobiles down near the roundhouse and west of the cinder pit, but one did not have to cross the cinder pit to get from the parking place to where witness was. King Wyatt came down there and said he had forgotten his key (to the lunch-box house) and asked witness for his key "to put the lunches in. I always made orders and put them in there and he had a key and whatever I sold I would pay him the next day." Witness gave Wyatt the key and sixty cents for three lunches he had sold Sunday, the day before. Witness did not see Wyatt alive again; when he next saw him, his body was being taken out of the cinder pit about four-thirty that afternoon; when Wyatt left him as above stated, witness did not look around or see which way he went. He was perhaps a little over five feet high, and had his left arm off "right below the shoulder."

On cross-examination, witness said Wyatt had been delivering the lunches to him down there (in the yards) for about a year. The arrangement with witness was made by Wyatt at witness' home prior to the time he began delivering them. The arrangement, witness said, was to sell the lunches to him (witness), to be sold by the latter to the men. Witness told Wyatt he would have to come down there before work started; the company would not want him to come down there after work started; that Wyatt must not be around hunting him up in the roundhouse, and must not hunt him up if he were out in the yards.

Witness further stated, under cross-examination, that at and prior to the time he saw Wyatt alive for the last time as indicated above, the lunch box was in the machine shop, connected, as heretofore stated, with the roundhouse. This was before the arrangement about the key was made, and when he *first* started to deliver lunches. Wyatt

would get to the yards at seven o'clock A. M., and witness and he would meet at the lunch counter in the machine shop. This was before working hours.

Witness further testified on cross-examination, that about three months after Wyatt first began delivering lunches down there, Wyatt asked him if he couldn't deliver the lunches later in the day, and it was at this time that the arrangement, for Wyatt also to have a key to the lunch box, was made.

Witness further testified on cross-examination that on this November 2, 1931, it was a nice clear day and that Wyatt came to him between ten-thirty and eleven o'clock, and when he first saw Wyatt before he got up to witness, he was coming around the north end of the pit. A coal chute is "still north of the end of the pit." Witness said he had himself come around the north end of the pit to get to the coal cars where he was working, at a place 100 or 150 feet (100 feet he judged) from the north end of the pit. There is a sand-house over on the west side, or side away from the Southwest Boulevard and west of the pit, from said sand-house the cinder pit could be seen; walking by the sand-house one can look and "easily see the pit."

Witness further testified, on cross-examination, that the level of the water in the pit was "at least *two feet below the top of the rails,*" (emphasis supplied).

The pit was used, witness testified, "for dumping the cinders, knocking the fire, and such as that, so as to put out the hot cinders;" they had cleaned the cinders out of the pit with a steam shovel *the day before the drowning occurred.* The top of the water was practically clear water; there were no cinders "to amount to anything" floating on top of the water; the water in the pit was "about twenty feet wide, across" over both tracks, twenty feet over all, both tracks" . . . and "about ten feet in between the tracks" and in between the rails of each track four feet eight inches a regular track gauge; these tracks passed the long way over the pit; the tie rods between the two rails of each track were about six feet apart. The cinder pit had been there ever since witness was employed in the yards, since 1912. As men that morning went arount the north end of the pit, witness said it was out there in plain sight. It was where witness could see it from where he was standing and "easy to see" from where Wyatt was standing, no cars were on any track between the pit and where Wyatt was. Witness said he paid Wyatt twenty cents apiece for the lunches and sold them to the men at twenty-five cents apiece and made five cents on each lunch which he kept for himself, the company getting no part of it.

Witness further testified on cross-examination that after Wyatt left him that morning he did not see which way Wyatt went; Wyatt could have gone back to the machine shop without crossing the pit,

he could have gone straight back to the shop on the space between the third and the fourth tracks, and there was a space between the third track and the cinder pit in which he could have walked to the roundhouse (or machine shop). Between three-thirty and four in the afternoon of that day, witness was in the roundhouse at work cleaning engines when he heard that Wyatt was missing; they looked in different places, never thought of the cinder pit, finally they saw his cap floating on the water therein as they were going by the cinder pit; men with long hooks and rods were put to work searching the pit. The water in the pit was "just about the same" distance from the top of the rail as it had been that morning. They found the body at a point in the pit about 100 feet from the north end thereof, or end away from the roundhouse, between the two inner rails of the tracks over the pit on each side thereof. When the water was up to the drain at the south end of the pit (which drain was two feet from the top) it would be still lower at the north end since the yards is "on a little slant." Witness said he never knew Wyatt to "go around and deliver separate lunches to separate men," he delivered the lunches at the lunch box.

Witness further testified that for the nine months after the arrangement was made for each to have a key to the lunch box and for Wyatt to deposit the lunches therein, Wyatt parked his car at the west end of the roundhouse; he had only one arm, and witness, once in a while, would watch him carry them in.

"THE COURT: What route did he take from the place he parked his car to deliver the lunches to you?

"THE WITNESS: Right straight through the roundhouse like you were going that way (indicating) when you come to the machine shop, you turn to the left and there was the lunch counter.

"THE COURT: On any of those occasions did he go anywhere near this cinder pit?

"THE WITNESS: *No, sir, nowheres near it.*

"THE COURT: During the three months previous to the happening of this occurrence, during which time you say he had a key and came down between ten and eleven o'clock, did you notice him on those occasions, where he would park his car?

"THE WITNESS: Not in particular unless I happened to be around there. Every time I noticed him it was up in the same place. I didn't always see him because he had a key.

"THE COURT: During those three months when he had a key had you ever seen him *anywhere near the cinder pit?*

"THE WITNESS: *No, sir.*

"THE COURT: *He had never come over to see you before this time?*

"THE WITNESS: *No, sir.*

"THE COURT: All right."

Witness did not always work out around the cinder pit but "only on occasions." He worked in the roundhouse most of the time.

Witness, on redirect examination, testified that he was about 100 feet from the north end of the pit the last time he saw Wyatt; the cinder pit was at least eight feet deep. In practical railroad work "if there were guards or anything along the side (of the cinder pit) they would be in the way of the men working along the side."

Paul Webb, a witness for plaintiff, and who kept a restaurant in the city, but who was on the police force in the detective department on November 2, 1931, testified that he went to the roundhouse yards in response to a call, and saw the cinder pit; the men were fishing for Wyatt's body. The appearance of the pit, that is, the east side of the end of the pit, "looked like cinders is about all, that time." Its color was "dark like a cinder bed." Witness further testified that after the body was taken out, he made an examination to ascertain where the solid ground of the cinder bed left off and the part that was in the pit began; there was a pile of cinders at each end of the pit, the cinders being both inside and outside of the pit; witness saw Mr. Northern, who was with witness at the time of their examination step on the cinders that were in the pit and they gave way in the middle of the pit; there were cinders floating on the surface of the water "very thick;" the water-level in the cinder pit was *just even with the lower part of the tracks.*" Witness said he made "a fairly close" examination of the pit; as one walked from the roundhouse, one could not see the pit as he approached, but witness saw it and did not fall in it. If one looked at the pit along *with* the tracks, it could be plainly seen "but if you got to coming across it sideways you couldn't." When one was right out at the side of it and looked at it, one could not see it, "not that way." When asked by the court what kind of cinders these were, witness said they were cinders from burned coal.

"THE COURT: You say you saw large quantities of coal cinders floating on top of the water?

"THE WITNESS: Yes, I did."

Peterson, the hereinabove named witness for plaintiff, was recalled and testified the condition of the water and the cinders around the "place where the boy was drowned were substantially (or practically) the same in the afternoon when they were fishing for his body, as they were in the morning."

William Northern, a witness for plaintiff, testified that he was a brother-in-law of Wyatt, having married the latter's sister; Wyatt and his wife lived with them; the family were, in November, 1931, "carrying on a box lunch business," calling themselves the "United Box Lunch." They delivered their product in a Chevrolet roadster. Witness, on November 2, 1931, or thereabouts, was called in connection with Wyatt's disappearance. He went down (to defendants'

yards) "to see what had happened to him; found his car (the Chevrolet roadster) parked down there and then we immediately started looking for him." . . . "Well, we looked all over the yards. That is, every place we could think of around there, and I happened to look into the cinder pit and saw his hat floating on the top of the water. It was his cap is what it was." When asked to describe what he saw there when he found the cap, he said, "I didn't know it was a pit. All I could tell there was water in it and clinkers was floating on top of it." After an objection was made to a question suggesting that they were cinders, and sustained, witness said, "Well there was cinders." When asked what was at each end, particularly the northeast end of that cinder pit, he replied—

". . . At the northeast end of it there was a grate across there, seems as though it was a roadway, or where men had been working back and forth across it."

(Here an objection was made but not ruled on.)

"Q. (By MR. BROWNE) Was it a roadway, or a path? A. It was a roadway for men to walk back and forth across.

"Q. What was the water level of this pit? How high up was this water with the cinders floating on, that you told about? A. I didn't understand.

"Q. How high up was the water with the cinders floating on top of it? A. Well, it was *very near level with the ground*. (Emphasis supplied.)

"Q. With which ground? A. With the ground on each side of the pit."

. . . . . .

"Q. Now, were there any cinders piled up in the cinder pit at the northeast end of the pit? A. Well, next to the—

"Q. That is, away from the roundhouse? A. Next to the path that goes across there, or grating, whatever it was, yes, sir.

"Q. There were? A. Yes sir.

"Q. That grating you are talking about was between which tracks? A. Well, as near as I can remember, it extended across both tracks on the northeast end.

"Q. On the northeast end? A. Yes sir.

"Q. Did it cross the rails between the tracks at all or was it only between the two sets of tracks? A. It was between the two sets of tracks."

Witness further testified that the cinders floating on top of the water there were black, and that the color of the roadbed on each end of the cinder pit, and also on both sides, was black and the same shade of black. Here witness was handed plaintiff's exhibits Nos. 1, 2, 3 and 4, being photographs of the yards at that point, and testified that they accurately represented the cinder pit as it appeared, except that the level of the water is lower than it was when

he saw them take the deceased out. Witness further swore that he saw a couple of marks "on those cinders slanting up from the end," they went toward the water but witness could not swear they were footmarks. He also swore that he saw no warning signs of any kind around there; King's body was taken out from the west side and, he thought, about fifteen feet from the northeast end or the far end, from the roundhouse. Witness saw Quigg down there when he went in there (the yards) on this lunch business; he, himself, was never ordered out of there nor did he, when he was there, ever hear Quigg order Wyatt out of there.

On cross-examination, witness said he himself delivered lunches about fifty per cent of the time on Sunday "to let the boy have a day off." He would deliver the lunches at the lunch box in the machine shop in the roundhouse. He would leave the lunches at the lunch box, "pick up the ones that were left over from the day before . . . and at the same time collect for the ones that were left." He never in his life went out wandering around the yards there around the cinder pit. He knew the purpose Wyatt had in having a key was so he could go there (at the lunch box), open it and put the lunches in, without going around there anywhere. The afternoon of November 2, 1931, when witness went out to the cinder pit was the first time witness had been there. The water at that time was *right up level with the roadbed* shown in the protograph, *much higher* than shown in the picture. The car of Mr. Wyatt that witness said he saw parked there, was "northwest of the roundhouse," and in going into the machine shop where the lunch box was, Wyatt didn't have to go anywhere near the cinder pit. The body was *not* found somewhere near 100 feet from the northeast end of the pit. At times he had gone to the yards with Wyatt and had seen him go out in the yards to get money from Peterson.

When they took Wyatt's body out of the water, if one "would look close" one could tell where the water began and the cinders left off "if there was something happened to hit the water, you could see the cinders wave, is about the only way I could see a man could tell it." The water was covered with cinders and witness said he could not tell what the color of the water was. "The surface was dark, the color of the cinders."

Witness further testified that in the very beginning of the arrangement about these lunches, he had a talk with foreman Yocum, and the later told him Peterson was the man that took care of the lunches and he would have to see him. Witness asked Yocum if it would be all right for him to find Mr. Peterson and to this Yocum said, "Yes," and also told witness he could bring the lunches "in there" (presumably in the roundhouse, or the lunch box in the machine shop).

Plaintiff testified that she was nineteen; that her husband never spoke of suicide; that he was always happy, that he couldn't swim and was afraid of water.

Peterson was recalled for further cross-examination by defendants and testified that he left the money for Wyatt in a tin cup in the lunch box, that was due him for the lunches sold; that the sixty cents on the day in question was in the cup, but nevertheless he paid it to him out of his pocket ''just because I had it with me, that is all.'' This, in substance, was all the testimony offered by plaintiff in her case in chief.

We have thus fully set out the evidence in the case so that the question here involved, as to the correctness of the trial court's action, may be fully understood and set forth.

In this case, all of the evidence is from witnesses placed on the stand by plaintiff. This fact, however, does not change, in its application to the case at bar, the rule that on a demurrer to the evidence, plaintiff is entitled to every reasonable inference fairly deducible from the facts proved, which are in her favor, and she must be given the most favorable construction to be placed on the evidence of which it is reasonably capable; and yet when the testimony of said witnesses contain clear positive proof, susceptible of but one conclusion, and that against plaintiff's right to recover, it must not be ignored. It is true that where the evidence of one or more witnesses is not favorable to plaintiff and other evidence of the same witness, or the evidence of other witnesses is *contrary* to such *un*favorable evidence, and favorable to plaintiff's right to recover, then, in considering whether a demurrer to the whole evidence is correct or not, the plaintiff is to be given the benefit of all the evidence favorable to her; in such circumstances the case should be allowed to go to the jury, for the latter is the judge of the evidence of the witnesses and of the weight to be given their testimony, *provided* the favorable evidence (when considered as a whole and as susceptible of being deemed true), is sufficient to make, in law, a case for plaintiff. In other words, on a demurrer to plaintiff's evidence, she is entitled to the benefit of every reasonable inference to be drawn from all the proof. [Ross v. Hoffman, 269 S. W. 679.]

It may be well at the outset of the consideration of this case, to observe that nowhere in the evidence above set forth (which, in substance, contains all the evidence) is there any showing that plaintiff's husband was an invitee, or even a licensee, to *that part* of the railway yards *where the pit* was located. He was not as to that part of the yards an invitee, in the sense of having either an *express* or implied invitation. Indeed, he was allowed to enter the yards merely to go to the machine shop which was a portion of the roundhouse and which was at least 300 feet from the nearest end of the cinder pit, and his permission to go to the machine shop, or to the place of delivery of

his lunches, was *expressly limited to that*. He was expressly told not to go out, or around in, the yards, not even to hunt up the man who was associated with him in his lunch business. At most he was a mere "licensee by implication" and that *only* to enter the roundhouse to deliver his product, and, in view of the prohibition against going elsewhere in the yards, he was, in legal effect, a trespasser elsewhere in such places. He was out in the forbidden district because of his own omission in failing to bring his key with him. Volunteers, bare licensees and trespassers take the premises for better or for worse, as they find them, assuming the risk of injury from their condition, "the owner being liable only for hidden dangers intentionally placed to injure them or for any wilful, illegal force used against them." [Kelly v. Benas, 217 Mo. 1, l. c. 9; Roe v. St. Louis, etc., Packing Co., 203 Mo. 11; Menteer v. Scalzo Fruit Co., 240 Mo. 177, a case wherein, like the one at bar, the deceased overstepped the bounds of the implied invitation or permission; Barry v. Calvary Cemetery Ass'n, 106 Mo. App. 358; Glaser v. Rothschild, 221 Mo. 180, 187; Forsythe v. Shryack-Thom Grocery Co., 283 Mo. 49.]

It is urged that because there is evidence tending to show that the surface of the water in the pit was covered with cinders like the adjoining surface of the ground, and that the water was at the same level as the ground, this is proof of negligence on the part of the defendant railway company, and that a failure to have a guard or warning was likewise negligence. These matters were certainly not negligence toward anyone who was aware of the existence of the cinder pit; and the evidence is that the placing of a guard or sign of warning would interfere with the use of the pit and with those who had to work thereat. Certainly it was not actionable negligence toward one who had no actual or implied legal right to be there, or in favor of plaintiff claiming under one who was not rightfully there.

There being no liability shown against the railroad company, it is manifest there was none shown against defendant Quigg. The action of the learned trial court, in denying a recovery, was right. Hence the judgment must be, and is, affirmed. It is so ordered. All concur.