**Charlton ANDERSON, Plaintiff-Respondent,**

**v.**

**Vaughn MANEVAL, d/b/a Maneval Grain and Supply Company, Defendant-Appellant.**

No. 8563.

Springfield Court of Appeals.

Missouri.

Dec. 16, 1966.

Motion for Rehearing or for Transfer to Supreme Court Denied Jan. 23, 1967.

Application to Transfer Denied March 13, 1967.

John R. Martin, Joplin, for defendant-appellant.

William C. Myers, Jr., Garold L. Morlan, Webb City, for plaintiff-respondent.

HOGAN, Judge.

Plaintiff Charlton Anderson has recovered the sum of $12,000.00 for personal injuries sustained as the result of a fall from his truck while he was on defendant's premises as a business visitor. The defendant has appealed, principally on the ground that plaintiff made no submissible case. The nature and extent of plaintiff's injuries are not in dispute. At the time in question, the defendant operated a grain and feed supply business in Jasper, Missouri, and it is conceded that the premises upon which the casualty occurred were under his control. It is also conceded that, at least initially, the plaintiff was present as an invitee or business visitor.

Taken most favorably to the result reached, the record shows that, among other things, defendant grinds and mixes grain to his customers' specifications. To obtain this service, the customer unloads his grain into a grain pit on the south side of the defendant's elevator. This pit or bin is located below and adjacent to a dock or platform which is part of the elevator; it is covered by a rectangular steel grate. The floor of the platform is about four feet above the grate, and above the floor of the platform there is a doorway seven feet high and five feet wide, which is covered by a two-piece sliding door hung on the outside of the building on an overhead rail. Customers who have grain to be ground back their trucks up even with or slightly over the grate and unload their grain into the pit. With the truck in position for unloading, the floor of the elevator is level with and at right angles to the bed of the truck, so that the doorway is immediately behind the customer's vehicle. In normal operation, the doors are opened by sliding them laterally along the overhead rail.

It was shown by the plaintiff that these doors had originally been a single overhead door, mounted on a vertical track so that it swung down and fastened at the bottom "like a garage door." The original door,

when closed, had been fixed and stationary. Sometime before the accident—Mr. Maneval testified it had been several years—the overhead door was "cut in two" and was made into sliding doors operated, as we have said, on a lateral track. At the time the sliding doors were installed, there had been a ledge or stop along the edge of the platform which "held the door firm," but shortly afterward the stop was removed. Defendant's explanation for the change in the height of the stop was that it had been too high to permit passage of a bulk feed cart which he used in connection with the grinding operation; consequently, a lower stop was installed. However, with the stop removed, the sliding doors, when closed, "swung in" at right angles to the track on which they were mounted. In any event, as we have noted, the doors had been in the condition in which plaintiff found them on the day of the accident for several years, and Mr. Anderson said that he had visited the premises regularly, "every ten days or two weeks," for sixteen or seventeen years prior to his injury. Plaintiff testified that he was familiar with this type of sliding door because he had several of them "at home," but he considered that such doors would be solid and "in the slot at the bottom." There is no contention that the doorway covered by the sliding doors was regularly used as a means of entrance or exit from the building itself; rather, the evidence shows that the platform was ordinarily used simply as a loading dock.

Mr. Anderson testified that on February 9, 1963, he went to the defendant's establishment "to get some calf feed and some hog feed ground." Arriving "around eleven or a little after eleven o'clock [A.M.]," plaintiff drove first to the scales where the defendant weighed his truck. Plaintiff asked to exchange some ear corn for shell corn, and the defendant agreed. Mr. Anderson then went to a nearby "corn crib" and unloaded approximately half of his load. In the process, he removed the tail gate from his truck and placed it in the bed of the vehicle. Mr. Anderson then drove his truck back to the grain pit, parking the rear of his vehicle above and slightly over the grate so the rear of the bed of his truck was level with and "two feet or a little better" away from the floor of the dock. Plaintiff testified that although the doors had always been open before, or had been opened by defendant's employees before he finished unloading, they were closed and remained so on this occasion.

After he parked his truck, plaintiff climbed into the bed of the vehicle and unloaded his corn into the grain pit. It was then plaintiff's intention to get out of the bed of his truck, go around to the scales for another weight, and pick up his load of mixed feed at the south side of the elevator. Ordinarily, in dismounting from his truck, that is, when the sliding doors were open, plaintiff "reached down * * * put my hands on the floor of the elevator, my left hand on the floor of the elevator, my right hand on the floor of the truck, lower[ing] myself down over this grate onto the grate and go around and get into the cab." On this occasion, since the doors were closed, the plaintiff took what seemed to him the easiest and safest way to get down, and "* * * squatted down in the back to get out, it was quite a little ways on down to the floor of the elevator where this little ledge was that was solid, so I reached out for a little bit of support against the door and when I touched the door, it just swung away from me," "quite a little ways." Plaintiff "went out head first," and sustained the injuries of which he complains.

Plaintiff also had evidence designed or intended to show that the ordinary and usual way for a customer to dismount from a truck, after dumping grain into the grain pit, was to get out the back of his truck. The force and effect of this evidence is in dispute, and we shall return to it in the course of the opinion.

On this appeal, the parties have briefed and vigorously argued a number of

points, but in the view we take of the case it is necessary to consider only the defendant's assignment that plaintiff made no submissible case. Specifically, the defendant's point is that he was not liable, inasmuch as the plaintiff was using the premises (the sliding doors) for a purpose other than that for which they were intended and in a manner which could not reasonably have been anticipated. We do not understand the plaintiff to contend that the sliding doors were unsafe for use as doors, nor is there any evidence tending to support such a contention; the plaintiff's theory of submission, as we understand it, and concisely put, was that the defendant should reasonably have anticipated that plaintiff would use the sliding doors as a means of support in getting off his truck, and that defendant was negligent in failing to make the doors reasonably safe for that purpose. Since the question whether a submissible case was made is inherent in every appeal,[1] we proceed to a consideration of that question, reviewing the evidence in a light most favorable to the plaintiff and giving him the benefit of all inferences reasonably to be drawn therefrom. Kettler v. Hampton, Mo., 365 S.W.2d 518, 521 [1]; King v. Ellis, Mo., 359 S.W.2d 685, 687 [1].

■ As the respondent correctly contends, the broad principle governing this appeal is not in dispute. The evidence establishes that the plaintiff was on defendant's premises as an invitee or business visitor; the applicable substantive law is that "a possessor of land is subject to liability for bodily harm caused to business visitors by a natural or artificial condition thereon if, but only if, he (a) knows, or by the exercise of reasonable care could discover, the condition which, if known to him, he should realize as involving an unreasonable risk to them, (b) has no reason to believe that they will discover the condition or realize the risk involved therein, and (c) invites or permits them to enter or remain upon the land without exercising reasonable care (i) to make the condition reasonably safe, or (ii) to give a warning adequate to enable them to avoid the harm without relinquishing any of the services which they are entitled to receive, if the possessor is a public utility." As the respondent reminds us, this is the rule laid down in the first Restatement of Torts, and it is firmly established as the law in this jurisdiction.[2] The problem, however, in all these premises liability cases is to determine "whether the facts and circumstances of the occurrence in question reasonably fit into the pattern of the rule as it has been established in Missouri." Wilkins v. Allied Stores of Missouri, supra, 308 S.W.2d at 628. The owner or occupant is not an insurer of the safety of his invitee, and liability does not result alone from (1) ownership or occupancy, (2) invitation, express or implied, and (3) injury. Gruetzemacher v. Billings, Mo., 348 S.W.2d 952, 957 [4]; Lindquist v. S. S. Kresge Co., 345 Mo. 849, 853–854, 136 S.W.2d 303, 305 [1–3]. The owner's or occupant's liability for injuries not intentionally inflicted must be predicated upon negligence, that is, upon what should reasonably have been anticipated, rather than what actually happened. Gruetzemacher v. Billings, supra, 348 S.W. 2d at 957 [3]; McCollum v. Winnwood Amusement Co., 332 Mo. 779, 787, 59 S.W. 2d 693, 697 [5, 6]; Hammontree v. Edison Bros. Stores, Mo.App., 270 S.W.2d 117, 126 [14]. In this particular instance, the defendant's maintenance of the sliding doors was not in itself an act of negligence, Hammontree v. Edison Bros. Stores, supra,

1. Gibbs v. Bardahl Oil Co., Mo., 331 S.W. 2d 614, 620 [1]; Hart v. Midkiff, Mo., 321 S.W.2d 500, 505 [4]; Lilly v. Boswell, 362 Mo. 444, 454, 242 S.W.2d 73, 77; and see Millar v. Berg, Mo., 316 S.W.2d 499, 502–503 [3].

2. Wilkins v. Allied Stores of Missouri, Mo., 308 S.W.2d 623, 628 [3]; Dean v. Safeway Stores, Mo., 300 S.W.2d 431, 432; Devine v. Kroger Grocery and Baking Co., 349 Mo. 621, 633, 162 S.W.2d 813, 818 [8]; Restatement, Torts, § 343, pp. 938–939 (1934).

270 S.W.2d at 127 [16]; Anno., 16 A.L.R. 2d 1161, 1163–1164, Section 2 (1951), and as the appellant maintains, the use of property for purposes for which it was not designed or intended, and the use of property by an invitee for purposes to which the owner or occupant could not reasonably have anticipated it would be put, imposes no liability upon the owner or occupant, except when the owner or occupant is present and actively co-operates with the invitee in the particular use of the premises.[3] It was incumbent upon the plaintiff in this case to show not only that his entry upon the premises was at the owner's invitation, but also that when he received his injury he was on a part of the premises which he was invited to use, *and was using them in a manner authorized by the invitation, whether express or implied.* Gruetzemacher v. Billings, supra, 348 S.W.2d at 958; Glaser v. Rothschild, 221 Mo. 180, 189–190, 120 S.W. 1, 4, 22 L.R.A.,N.S., 1045, 1049. In oral argument before the court both parties concede, and we believe, that the essential meritorious question on this appeal is whether the evidence, taken most favorably to plaintiff, shows that his use of the sliding doors as a means of assistance in dismounting from his truck was a use of the premises which defendant should reasonably have anticipated.

Before we consider plaintiff's evidence bearing on this question, we should note certain other aspects of the case which, in our view, distinguish it from those cases involving swinging or revolving doors used as such, and from those cases involving a customer's entrance in or exit from the invitor's premises. As we have indicated, there is no evidence upon the record before us and, as we understand the parties, no contention that the sliding doors, used as such, were unsafe. The case is therefore not really comparable to such cases as Hammontree v. Edison Bros. Stores, supra, 270 S.W.2d 117, upon which plaintiff relies, and other "swinging door" cases, e. g., Morelock v. De Graw, 234 Mo.App. 303, 112 S.W.2d 126, and Boyle v. Neisner Bros., 230 Mo.App. 90, 87 S.W.2d 227, in which the real matter at issue was whether the doors created a potential hazard in normal use. Nor is the situation at hand comparable to those cases dealing with unsafe entrance ways or exits, for the plaintiff was not trying to gain access to the grain elevator itself; the "egress" of which plaintiff speaks here was "egress" from his truck to the ground. In short, the essence of plaintiff's claim is that defendant was bound to foresee or anticipate a potential hazard from customers' use of the sliding doors in the process of dismounting from their trucks, because such practice was usual and customary, even though it was a use of the premises for which they were not designed or intended.

Plaintiff's evidence bearing on this aspect of the case came from several witnesses. Mr. Anderson himself testified that, in all the time he had been dealing with the defendant, he "had never remembered of them [the sliding doors] being closed and staying closed until I had finished unloading feed." The usual way the plaintiff dismounted was to " * * * [reach] down and when the doors were open, put my hands on the floor of the elevator * * * my right hand on the floor of the truck, lower myself down over this grate onto the grate and go around and get into the cab." Plaintiff had seen "many" people "get out the back" of their trucks, but had also "seen them get out different ways." Mr. Anderson also testified that it was possible for a customer using defendant's grain pit to descend in a number of other ways. Mr. Anderson could

---

**3.** Gruetzemacher v. Billings, supra, 348 S.W.2d at 959; Leenders v. California Hawaiian Sugar Refining Corp., 59 Cal. App.2d 752, 139 P.2d 987, 989–990 [2, 3]; Edwards v. Johnson, Ky., 306 S.W.2d 845, 848 [8]; Cupita v. Carmel Country Club, Inc., 252 N.C. 346, 113 S.E.2d 712, 715 [6]; Parsons v. Drake, 347 Pa. 247, 32 A.2d 27, 30 [9]; 65 C.J.S. Negligence § 63(52), pp. 756–757; 38 Am.Jur. Negligence, § 101, p. 762. See also Anno., 30 A.L.R. 1390 (1924).

have gone out over the side of his truck, but did not often do so with the end gate out because "the sides flop back and forth." He could have sat down on the bed of his truck to dismount, in which case his feet would have been "a foot to eighteen inches" above the grate. Plaintiff simply chose the method of descent he used because he considered it to be the "safest" way. The plaintiff also introduced in evidence the answer to a written interrogatory, which indicated that a customer's usual method of exit from the back of his truck was "over the side of the truck or off the back of the truck."

Along this same line, Mr. Lawrence Fox, a former employee of defendant who had installed the sliding doors, testified:

"Q. Do you know how the customers generally got off their trucks after they got through unloading their grain there?

A. Well, the procedure was either step inside there or—

Q. Across the opening through the door when it was open?

A. Yes. —or down on the grate or on off the side. On the side of the truck it's quite a step and usually a fellow would go to the back and get down.

Q. Go off the back down onto the grate?

A. Yes.

Q. That was the usual and normal method of egress from the truck. That's all."

On cross-examination, Mr. Fox testified:

"Q. And customers got in and out of the truck bed in all different manners, didn't they?

A. Yes.

Q. Over the side, over the top of the load, every which way, didn't they?

A. Yes, sir.

Q. And some of your customers have little running ladders extending down

from the truck itself, don't they, that they can step down on?

A. Well, no, that was seldom you ever saw one of those, if it was, it was a trailer hitch.

Q. But some of them did have that didn't they?

A. Well, I think so."

Mr. Walter Huber, a customer of defendant upon whose evidence the plaintiff places considerable emphasis, testified on direct examination:

"Q. I'll ask you whether or not you had any—do you know how the customers normally get out of the back of the truck after they have unloaded their grain there?

MR. MARTIN: If the Court please, this calls for a conclusion on the part of this witness. He can testify how he gets out.

Q. Have you see [sic] others get out of the truck?

THE COURT: Let the record show the objection is sustained as to how—the customary method of getting out.

Q. Have you seen other people get out of their trucks there?

A. Yes, I have.

Q. About how many people have you seen get out of their trucks after they unloaded their grain?

A. That would be a hard question to answer.

Q. Many or few?

A. I've seen several—quite a few.

Q. Of those that you have observed, what would be the usual method by which they would get out of their truck after they had unloaded their grain?

MR. MARTIN: If the Court please, I object to what the usual—.

THE COURT: The objection will be sustained.

Q. All right. Tell the different ways that you have seen people get out of their trucks after unloading the grain.

A. The most—I'd say most of them get out the back.

Q. All right. You have seen them get out in other ways?

A. Yes."

We have no doubt that an owner's or occupant's liability to his business invitee depends on circumstances, and that customary use of an invitor's premises in a manner or for a use for which they were not originally designed or intended may enlarge the scope of the owner's or occupant's duty, provided he has actual or constructive notice of such customary use.[4] As we read it, Streicher v. Mercantile Trust Co., Mo., 31 S.W.2d 1065, upon which the plaintiff relies, is simply an application of that principle. In that case, the plaintiff was making a use of the premises for which they were not designed or intended; instead of using a ladder to apply a coat of paint, the plaintiff stood upon the window sill and supported himself by holding onto the sash. He was injured when the sash gave way, but there was evidence to show that this method of work was customary with experienced painters, that defendant had at least constructive knowledge of the plaintiff's use of the sill as a means of support, and that the defendant knew or should have known of the defective condition of the sill.

There is no such showing in the instant case. Granting for the sake of argument that defendant's duty might have been enlarged to require the provision of safe support for customers dismounting from their trucks if there were evidence that customers ordinarily used the building in the process of alighting from their vehicles, no such evidence appears on this record. Plaintiff himself had never before dismounted from his truck with the doors closed, and in effect he testified only to his own choice of the safest method of descent. The evidence given by Mr. Fox and Mr. Huber, upon which plaintiff relies, merely shows in sum that customers usually got out the back or over the side of their trucks. As defendant points out, there is scarcely any other way to dismount, and we find ourselves unable to resolve this testimony into evidence that defendant's building was customarily involved when a customer got off his truck. To extend the defendant's duty to the point of requiring him to furnish a safe support for customers dismounting at his grain pit would require him to foresee a hazard which, under the evidence, was not reasonably to be anticipated, and for this reason we believe the plaintiff failed to make a submissible case.

For the reasons indicated, the judgment is reversed and the cause is remanded with directions to enter a judgment for the defendant.

STONE, P. J., concurs.

TITUS, J., took no part in the consideration or decision of this case.

4. Glaser v. Rothschild, supra, 221 Mo. at 186, 120 S.W. at 3, 22 L.R.A.,N.S., at 1047; Trautloff v. Dannen Mills, Mo. App., 316 S.W.2d 866, 874 [11]; Smith v. August A. Busch Co. of Mass., 329 Mass. 615, 109 N.E.2d 843, 846; Eklund v. Kapetas, 216 Minn. 79, 11 N.W.2d 805, 807 [4]; see also Denison v. Wiese, 251 Iowa 770, 102 N.W.2d 671, 675 [10]; 65A C.J.S. Negligence, § 233, p. 643.